[CONSTRUCTION OF TREATY. LOCAL LAW.]

HENDERSON, Plaintiff in Error, *against* POINDEXTER'S Lessee, Defendant in Error.

Spanish grants, made after the treaty of peace of 1782, between the United States and Great Britain, within the territory east of the river Mississippi, and north of a line drawn from that river at the 31st degree of north latitude, east to the middle of the river Apalachicola, have no intrinsic validity, and the holders must depend for their titles exclusively on the laws of the United States.

No Spanish grant, made while the country was wrongfully occupied by Spain, can be valid, unless it was confirmed by the compact between the United States and the State of Georgia, of the 24th of April, 1802, or has been laid before the board of commissioners constituted by the act of Congress of the 3d of March, 1803, ch. 340. and of March 27th, 1804, ch. 414.

*Feb. 17th.*

THIS cause was argued by Mr. *Webster* and Mr. *Coxe,*, for the plaintiff in error,[a] and Mr. *D. B. Ogden,* for the defendant in error.[b]

*March 7th.*

Mr. Chief Justice MARSHALL delivered the opinion of the Court.

This is a writ of error to a judgment rendered in the Court of the United States for the District of Mississippi, in an ejectment brought by the defendant in error.

George Poindexter, the lessor of the plaintiff, claimed title to the premises in controversy by virtue of several patents regularly issued to him under the laws of the United States. If the lands were, at the time, grantable, his title is unquestionable. Consequently, the case depended, in the District Court, on the title of the defendant in that Court. Under several opinions given by the judge to the jury, to which bills of exceptions were taken, a verdict was found

a *Las Partidas*, 381. 1. 16. 384. 1. 21. 382. 1. 18. *Civ. Code of Louisiana,* 478. art. 23, 24. 484. art. 43. 486. art. 57. 5 *Hall's Law Journ.* 390. 3 *Dyer,* 355. (*a.*) 10 *Johns. Rep.* 23.

b *Vattel, Droit des Gens,* 1. 1. ch. 20. s. 244. 263.

for the plaintiff in ejectment, the judgment on which has been brought before this Court. The case must depend on the correctness of the opinions given by the District Judge; but as those opinions bring the title of the defendant in ejectment before this Court, the case will be best understood by taking a general view of the principles on which that title stands.

1827.

Henderson
v.
Poindexter's
Lessee.

The defendant gave in evidence a grant from the government of Spain for 1,000 acres of land, bearing date on the 20th of June, 1795, with a plat, and certificate of survey annexed; under which grant he claimed so much of the land in controversy as it covered. He also offered in evidence a duly certified copy of a certificate of survey and patent issued thereon to David Pannell, for 500 acres, the residue of the premises in controversy; the certificate by the Spanish Surveyor General Carlos Trudeau, dated the 25th of March, 1795, and the patent issued December 7th, 1797, by Manuel Gayoso, the Spanish Governor of West Florida, with a deed of release and confirmation from David Pannell to him, dated January 19th, 1820. It was admitted, that the originals of the plat, and certificate of survey, and of the patent thereon, of which copies were offered, were not in his possession, nor under his control. These papers were rejected, and a bill of exceptions was taken to the opinion rejecting them.

The defendant also read the deposition of Tessias, to prove the fairness of the grants under which he claimed, and that they were regularly issued by the proper officers of the Spanish government at the time they bear date respectively. To rebut this testimony, the plaintiff in ejectment produced a letter of instructions found among the papers of William Atcheson, deceased, the deputy surveyor, by whom the lands in controversy were surveyed. This letter was directed to William Atcheson, and was proved to be in the hand-writing of William Dunbar, who is also dead, and who was proved to be the principal surveyor of the District of Natchez, under whom Atcheson acted. The signature appears to have been torn off. This paper tended to show, that the surveys and grant were not made at the time they bear date, but afterwards. The defendant objected

to its admission, but his objection was overruled, and to this opinion also, he took an exception.

The defendant prayed the Court to instruct the jury,

1st. If they should find that, at the time of the sale by the United States of the premises in question, the defendant was in full possession thereof under an adverse title, or colour of title, such sale was void, and passed no title on which the plaintiff could recover.

2d. If they should find, that the defendant, and those under whom he claimed, had the uninterrupted and quiet adverse possession of the premises, claiming under a Spanish title legally and fully executed prior to October 27th, 1795, under which the possession was originally taken, that the plaintiff cannot recover.

3d. If the jury should find, that on the 20th of June, 1795, a patent emanated from the Spanish government to Joseph Pannell, under whom the defendant claimed, then such patent constituted a good title in the grantee, and those claiming under him, although the grantee was not, on the 27th of October, 1795, an actual resident of the territory ceded by Georgia to the United States.

4th. If the jury should believe that Joseph Pannell, under whom the defendant claimed, on or before the 27th of October, 1795, was a resident of the said territory, and that he claimed the premises in controversy by virtue of a Spanish patent legally and fully executed prior to that day, the defendant is entitled to a verdict.

5th. That the paper purporting to be a copy of the articles of agreement between Joseph Pannell and Francis Poussett, dated September 20th, 1796, was competent testimony to prove any fact in controversy between the parties in this suit.

6th. If the jury should be of opinion, that the date attached to the paper purporting to be the instructions from William Dunbar to William Atcheson, is an interpolation or forgery, in such case they shall disregard it altogether.

7th. In this action of ejectment, after a long and continued possession of thirty years on the part of the defendant, and those under whom he claims, under title, or colour of title, the jury are authorized to presume that it had a legal

origin, and was legally continued in the defendant, and those under whom he claims, in the absence of satisfactory proof to the contrary.

8th. If the jury should believe, that the survey made by William Atcheson in September, 1795, was made at the time it purports to bear date, that then, and in such case, it will constitute an instrument of a higher and superior nature to the instrument purporting to be private instructions from said Dunbar to said Atcheson, for the purpose of proving the residence of the said Pannell at that time.

9th. That if, on the whole matter, the jury should have a reasonable doubt, then their verdict should be for the defendant.

The Court granted the 4th, 6th, 7th, and 9th prayers, but refused the 1st, 2d, 3d, 5th, and 8th, to which refusal the counsel for the defendant excepted.

In argument, two general questions have been made.

1st. Is the title set up by the plaintiff in error under the Spanish government, sufficient in itself to protect his possession?

2d. Has it been recognised and confirmed by the United States?

1. The first point has been argued very elaborately, and with deep research. The Court will not enter into the reasoning of the parties, but will state the result of an attentive consideration of that reasoning.

It is undoubtedly true, that the exact boundary line between the southern British Colonies and Florida, was never adjusted while that province remained in possession of Spain. Each crown claimed territory which had been granted by the other, and was settled by its subjects. Florida was at length ceded to Great Britain; after which, the 31st degree of north latitude was, by the proclamation of 1763, established as the dividing line between that province and Georgia. The crown, however, was in the habit of changing the limits of the colonies; and, though we complained of the manner in which this branch of the prerogative was exercised, we did not resist it. In consequence of a recommendation of the board of trade, the limits of Florida were supposed to be extended, as appears by the commissions to

its governor, so as to comprehend the land in controversy. This was the state of things when the war of our revolution commenced. In its progress Spain took part in it, and re-conquered Florida. At the treaty by which that war was terminated, Great Britain acknowledged the United States to be free, sovereign and independent, and treated with them as such. Their boundaries were particularly described, so as to comprehend the land in controversy. The preliminary articles of peace between the United States and Great Britain were signed at Paris, on the 30th of November, 1782. But these articles were provisional, and were not to take effect until terms of peace should be agreed upon between Great Britain and France. On the 20th of January, 1783, preliminary articles of peace were signed between Great Britain and France, and between Great Britain and Spain. In the treaty with Spain, the Floridas were ceded to that power without any description of boundary.

The United States continued to assert a claim to the 31st degree of north latitude, while Spain maintained perseve-ringly her pretensions to extend farther north. This was the subject of long and fruitless discussion between the two governments, which was terminated by the treaty signed at San Lorenzo el Real on the 27th day of October, 1795. By this treaty, " the high contracting parties declare and agree, that the southern boundary of the United States, which di-vides their territory from the Spanish colonies of East and West Florida, shall be designated by a line beginning on the river Mississippi, at the northernmost part of the 31st de-gree of latitude north of the equator, which from thence shall be drawn due east to the middle of the river Apalachi-cola, or Catahouchee; thence, "&c. This treaty declares and agrees that the line which was described in the treaty of peace between Great Britain and the United States as their southern boundary, shall be the line which divides their ter-ritory from East and West Florida.

The article does not import to be a cession of territory, but the adjustment of a controversy between the two na-tions. It is understood as an admission that the right was originally in the United States. Nor is there any thing ex-traordinary in this admission. The negotiations were all

depending at the same time and the same place. That be-
tween the United States and Great Britain was first com-
pleted and signed; it must have been communicated to
France, and, of course, was known to Spain; in it the
southern boundary of the United States was accurately de-
fined. The subsequent cession of the Floridas to Spain
contained no description of boundaries. Great Britain
could not, without a breach of faith, cede to Spain what she
had acknowledged to be the territory of the United States.
No general words ought to be so construed. We think that
Spain ought to have understood the cession, and must have
understood it, as being made only to the extent that Britain
might rightfully make. This opinion is confirmed by a sub-
sequent part of the same article, which respects the troops,
&c. of either party in the territory of the other. It is in
these words: "And it is agreed that, if there should be any
troops, garrisons, or *settlements* of either party in the territo-
ry of the other, according to the abovementioned bound-
aries they shall be withdrawn from the said territory with-
in the term of six months after the ratification of this treaty,
or sooner, if it be possible; and that they shall be permitted
to take with them all the goods and effects which they pos-
sess."

It has been very truly urged by the counsel for the de-
fendant in error, that it is the usage of all the civilized nations
of the world, when territory is ceded, to stipulate for the pro-
perty of its inhabitants. An article to secure this object, so
deservedly held sacred in the view of policy, as well as of
justice and humanity, is always required, and is never re-
fused. Had Spain considered herself as ceding territory, she
could not have neglected a stipulation which every sentiment
of justice and of national honour would have demanded, and
which the United States could not have refused. But in-
stead of requiring an article to this effect, she has expressly
stipulated for the withdrawal of the settlements made within
what the treaty admits to be the territory of the United States,
and for permission to the settlers to bring their property with
them. We think this an unequivocal acknowledgment, that
the occupation of that territory by Spain was wrongful; and
we think the opinion thus clearly indicated was supported

1827.

Henderson
v.
Poindexter's
Lessee.

by the state of facts. It follows, that Spanish grants, made after the treaty of peace, can have no intrinsic validity, and the holders must depend for their titles on the laws of the United States. We proceed, then, to inquire into the rights of the plaintiff in error under those laws.

The first act to which our attention has been directed, is that by which Georgia ceded her western territory to the United States. That act provides, "That all persons who, on the 27th day of October, 1795, were actual settlers within the territory thus ceded, shall be confirmed in all the grants legally and fully executed prior to that day by the former British government of West Florida, or by the government of Spain."

On the 3d of March, 1803, (vol. 3. s. 546.) Congress passed "an act regulating the grants of land, and provided for the disposal of the lands of the United States south of the State of Tennessee."

The first section enacts, that any person or persons "who were resident in the Mississippi territory on the 27th day of October, 1795, and who had, prior to that day, obtained, either from the British government of West Florida, or from the Spanish government, any warrant or order of survey for lands lying within the said territory, to which the Indian title had been extinguished, and which were, on that day, actually inhabited and cultivated by such person or persons, or for his or their use, shall be confirmed in their claims to such lands, in the same manner as if their titles had been completed."

This section places those persons, who had obtained a warrant or order of survey on the 27th of October, 1795, on equal ground with those whose titles were completed, provided the Indian title was extinguished, and provided also, the land claimed was actually inhabited and cultivated either by the person claiming title, or by some other for his use.

The second section provides for those who did, on that day of the year 1797, when the Mississippi territory was finally evacuated by the Spanish troops, actually inhabit and cultivate a tract of land in that country ; and the third sec-

tion gives a pre-emption to those who did actually inhabit and cultivate a tract of land at the time of passing the act.

The 4th section enacts. that two land offices shall be established tor the disposal of the lands of the United States in the Mississippi territory, one in the county of Adams, and the other in the county of Washington; and the fifth directs, " that every person claiming lands by virtue of any British grant, or of the three first sections of the act, or of the articles of agreement and cession between the United States and the State of Georgia, shall, before the last day of March in the year 1804, deliver to the register of the land office within whose district the land may be, a notice in writing, stating the nature and extent of his claims, together with a plat of the tract or tracts claimed; and shall also, on or before that day, deliver to the said register, for the purpose of being recorded, every grant, order of survey, and conveyance or other written evidence of his claim, and the same shall be recorded," &c.; " and if such person shall neglect," &c. " all his right, so far as the same is derived from the abovementioned articles of agreement, or from the three first sections of this act, shall become void, and for ever thereafter be barred."

The sixth section directs the appointment of two boards of commissioners, for the purpose of ascertaining the right of persons claiming the benefit of the articles of agreement and cession between the United States and the State of Georgia, or of the three first sections of the act. One of these boards was to take cognizance of claims to lands lying west of Pearl river, and the other of claims to lands lying east of that river. Each board was empowered to hear, and determine, and decide, in a summary manner, all matters respecting such claims within their respective districts; and their determination so far as relates to any rights derived from the articles of agreement with Georgia, and from the three first sections of the act, was declared to be final. The act proceeds to direct that each board may appoint a clerk, " whose duty it shall be, to enter in a book, to be kept for that purpose, perfect and correct minutes of the proceedings, decisions. meetings and adjournments of the boards. together with the

*1827.*

Henderson
v.
Poindexter's
Lessee.

evidence on which such decisions are made; which books and papers, on the dissolution of the boards, shall be transmitted to, and lodged in the office of the Secretary of State. The commissioners are directed to grant certificates to all persons in whose favour decisions shall be made, which certificates are to be recorded by the register of the land office; and amount, in all cases where grants have been made, to a complete relinquishment on the part of the United States; and, where grants have not been made, entitle the party to receive one from the United States.

A supplemental act was passed in March, 1804, which prolonged the time until the last day of November in that year for giving the notice prescribed by the 5th section of the original act, to the register of the land office, of claims to lands lying west of Pearl river, for the purpose of being recorded. This act provides, that in cases of a complete British or Spanish grant, it shall not be necessary for the claimant to have any other evidence of his claim recorded except the original grant or patent, together with the warrant or order of survey, and the plot. The 3d section enacts, "that when any Spanish grant, warrant, or order of survey, shall be produced to either of the said boards, for lands which were not, at the date of the instrument, or within one year thereafter, inhabited, cultivated, or occupied, by or for the use of the grantee, or whenever either of the said boards shall not be satisfied that such grant, warrant, or order of survey, did issue at the time when the same bears date, the said commissioners shall not be bound to consider such grant, warrant, or order of survey, as conclusive evidence of the title, but may require such other proof of its validity as they may deem proper; and the said boards shall make a full report to the Secretary of the Treasury, to be by him laid before Congress for their final decision, of all claims grounded on such grants, &c. as may have been disallowed by the said boards, on suspicion of their being antedated or otherwise fraudulent."

It is contended by the plaintiff in error, that these several acts confirm the titles of all those who held lands under the Spanish government, by virtue of grants or orders of survey which were made with good faith prior to the 27th day of

1827.

Henderson
v.
Poindexter's
Lessee.--

October, in the year 1795. The defendant in error maintains, that they confirm the titles of those only who were actual settlers of the Mississippi territory anterior to that day.

It is admitted, that the State of Georgia, in its act of cession, has stipulated for those only who were actual settlers on the 27th of October, 1795, and who held grants legally and fully executed at that time.

The first section of the act of 1803, comprises incomplete titles only, and does not extend to those which were comprehended in the act of cession. It is, in terms, limited to actual settlers; and no person who was not an actual settler can claim under that act. The silence observed by Congress respecting grants fully executed, countenances the opinion, that the articles of agreement between the United States and Georgia were supposed to be in themselves a confirmation of the titles of those who were within the words of the instrument. But as the legislature was making provision for the sale of the vacant lands within the ceded territory, it was deemed necessary to ascertain the particular lands which were appropriated. The 5th section of the act, therefore, requires, that every person having such claims shall, before the last day of March, in the year 1804, deliver a notice in writing, specifying the extent of his claims, to the register of the land office, together with his title papers, that they may be recorded. On failure, his title, so far as it is derived from the three first sections of the act, or from the articles of agreement with Georgia, shall become void; nor shall such title paper " be considered or admitted as evidence in any Court of the United States, against any grant derived from the United States."

So far as titles were derived from the act itself, no person could complain of this restriction. It was, however, a very rigorous law as respected those who were protected by the articles of agreement of Georgia.

This act certainly contains no confirmation of Spanish titles, except of those which were held by persons who were actual settlers at the time prescribed in the law itself. It provides for the sale of all the unappropriated lands, and establishes a tribunal with power to decide on all titles.

The language of the act of the 27th of March, 1804, is

less explicit. It declares, " that persons claiming lands in the Mississippi territory, by virtue of any British or Spanish grant, or by virtue of the three first sections of the act to which this is a supplement, or of the articles of agreement and cession with the State of Georgia, may, after the last day of March, in the year 1804, and until the last day of November then next following, give notice in writing of their claims to the register of the land office, for the lands lying west of Pearl river, and have the same recorded, in the manner prescribed by the 5th section of the act to which this is a supplement."

The defendant in error contends, that, although the descriptive words of the act apply generally to persons claiming lands under British or Spanish grants, they ought to be confined to the actual settlers of the country. This construction rests chiefly on the argument, that the act of 1804 is a mere supplement to the act of 1803; that the two laws ought to be construed together; that their great object is to quiet possession, and that the main purpose is to give a longer time for recording claims to lands lying west of Pearl river.

There is, we think, great difficulty in maintaining this construction. It has been observed, and the observation has great weight, that all British and Spanish grants held by persons who were actual inhabitants of the country, on the 27th of October, 1795, were protected by the articles of agreement with the State of Georgia. Yet these persons are enumerated in the act as constituting a distinct class of claimants not provided for in that compact. The inference is very strong, that Congress must have supposed there was such a class. The concluding words of the section indicate the same idea. They are, " and the powers vested by law in the commissioners appointed for the purpose of ascertaining the claims to lands lying west of Pearl river, shall, in every respect, extend and apply to claims which may be made by virtue of this section ; and the same proceedings shall thereupon be had as are prescribed by the act aforesaid, in relation to claims which shall have been exhibited on or before the last day of March, in the year 1804."

This language, we think, adapted to new claims, as well as to a prolongation of the time in which claims may be recorded, as the preparatory step to laying them before the commissioners. It is observable, too, that the 5th section of the act of 1803 mentions British, but not Spanish grants. They are comprehended in that class of claims which were confirmed by the articles of agreement with Georgia. The act of 1803 contemplates no Spanish grant that was not protected by those articles. The act of 1804, however, introduces Spanish with British grants, and places them together, as forming a class of cases not provided for in the compact with Georgia. We cannot suppose, that the legislature would have changed its language, and have introduced the words Spanish grants, with directions that they should be recorded, and laid before the commissioners, if nothing existed to which the words would be applicable.

The language of the third section also indicates an opinion, that persons, not inhabitants of the country on the 27th of March, 1795, might be entitled to land under a Spanish grant, warrant, or order of survey. It provides for the case of a claim to land which was not, at the date of such grant, &c. or within one year thereafter, inhabited, cultivated, or occupied by or for the use of the grantee. Now, land might be inhabited, cultivated, or occupied, for the use of a grantee who was not himself an inhabitant of the country, or might be occupied by himself within one year after the date of the grant, though not so occupied on the 27th of October, 1795. The act goes on to provide, that, in such case, or whenever the commissioners shall not be satisfied that the grant, &c. issued at the time it bears date. such grant, &c. shall not be conclusive evidence of the title. This language might certainly justify the implication that Congress supposed the commissioners might establish titles in favour of non-residents.

The decision of the commissioners against them is not to be final. They are to be reported to the Secretary of the Treasury, to be by him laid before Congress for the final decision of that body.

On the 28th of February, 1809, Congress appears to have acted on this report. An act was then passed. directing the

1827.

Henderson
v.
Poindexter's
Lessee.

lands, the claims to which had been disallowed by the com-
missioners, to be sold in the same manner as other public
lands. The same act reserves the right of the Spanish
claimant to institute his suit in the highest Court of law or
equity in the said territory, for the recovery of the land,
within one year after it shall have been sold by the United
States. If he shall fail to sue within the time limited, his
right to sue shall be for ever barred. The second section
makes the decision of such cause to depend entirely on the
claimant's proving that the survey was made before the
27th of October, 1795, and on the fairness of the transac-
tion ; and the third section declares parol evidence to be
admissible.

This act relates solely to those claims which were laid be-
fore the commissioners, and disallowed.

The patent under which the plaintiff in error claims the
tract of 1,000 acres, appears to have the following endorse-
ments on it :

" Entered on record at Natchez, in the county of Adams,
Mississippi territory, in lib. B. fol. 149 a 150, this second
day of April, A. D. 1801.

" JOHN HENDERSON, *Recorder.*"

" *Land Office west of Pearl river.*

" This plat, certificate, and letters patent, are recorded in
the Register's book B, of written evidences of claims, fol.
621. &c.

" Examined and corrected by

" J. GIRAULT, *Translator.*"

The plat, and certificate of survey, and patent for 500
acres, appear to have been registered in the land office west
of Pearl river, on the 26th of March, 1804.

The patent for this last survey gives no additional title,
because it was granted after the authority of Spain over the
country had ceased. It does not appear that either of these
title papers was laid before the board of commissioners.

There is certainly some difficulty in construing these acts
of Congress. It is not easy to resist the conviction, that
the government has legislated on the idea, that Spanish
titles might be valid, though held by persons who were not

residents of the country on the 27th of October, 1795. Yet no law has, in express terms, imparted this validity to them. The act of 1804 allows them to be recorded, and to be laid before the commissioners, to be decided on by them. It goes farther, and seems to point the attention of the commissioners to the fairness of the claim, rather than to the residence of the claimant. The certificate of the board in favour of the claimant is conclusive against the United States. Their determination against him is to be reported to the Secretary of the Treasury, in order to be laid before Congress; and this determination is to be founded on the opinion, that the document of title is antedated, or otherwise fraudulent. When Congress acts on this report, no absolute decision is made against the rejected claims, but the claimant is allowed time to assert his title in a Court of law or equity. These provisions are scarcely to be reconciled with the idea, that no Spanish grant could be valid if made to a non-resident of the territory. It would seem as if the commissioners might have taken cognizance of such a claim, might have decided in its favour, and that such a decision would have been conclusive.

But, we repeat, that there is no act of Congress expressly confirming such titles, and that they derive no validity from any other source.

The whole legislation on this subject requires, that every title to lands in the country which had been occupied by Spain, should be laid before the board of commissioners. The motives for this regulation are obvious; and as the titles had no intrinsic validity, it was opposed by no principle. Claimants could not complain, if the law which gave validity to their claims, should also provide a board to examine their fairness, and should make the validity depend on their being laid before that board. The plaintiff in error has failed to bring his case before the tribunal which the legislature had provided for its examination, and has, therefore, not brought himself within the law. No act of Congress applies to a grant held by a non-resident of the territory in October, 1795, which has not been laid before the board of commissioners. It is true, that no act has declared such grants void; but the legislature has orde ed the lands to be

sold which were not appropriated in a manner recognised by law, and the land in controversy is of that description.

If this view of the subject be correct, no Spanish grant, made while the country was wrongfully occupied by Spain, can be valid, unless it was confirmed by the contract with Georgia, or has been laid before the board of commissioners.

This opinion is decisive of every point on which the Court gave an opinion, so far as respects title.

The first bill of exceptions, taken by the plaintiff in error, is to the rejection of a duly certified copy of a certificate of survey, and a patent issued thereon by the Spanish governor of West Florida in December, 1797.

The patent was properly rejected, because Spain no longer occupied the territory, and the authority which had been exercised, in fact, by the Spanish government, had ceased. The order and certificate of survey were properly rejected, because they were not confirmed by the three first sections of the act of 1803, and had never been laid before the board of commissioners.

The paper dated the 19th of October, 1796, purporting to be private instructions from William Dunbar, the principal surveyor of the district of Natchez, to William Atchison, the deputy, who made the surveys for the land in controversy, was admitted to rebut the testimony of a witness whose deposition had been taken to prove that the Spanish title papers were fair and were correctly dated. This paper was admitted, because it related to the official duties of the deputy, was found among his papers after his death, and was proved to be in the hand-writing of his principal, who was also dead. Doubts are entertained by some of the Judges respecting the propriety of its admission. But this is a question which we think it unnecessary to decide, because the grant, not having been laid before the board of commissioners, could not have availed the defendant in the Court below, who did not bring himself within the reservation of the cession from Georgia.

The plaintiff in error, after the testimony had been laid before the jury, prayed the Court to instruct them on several points of law which grew out of it. The first of these

which was refused, questioned the validity of a grant made by the United States for land occupied at the time under colour of an adverse title. There can be no doubt of the correctness of rejecting this proposition.

The 2d, 3d and 5th points, which the Court was prayed to state as law to the jury, depend on the position that residence in the country on the 27th of October, 1795, was not necessary to the validity of the title set up by the defendant in that Court. As the title had not been laid before the board of commissioners, and as residence was indispensable to the validity of a claim, supported by the act of cession from Georgia, we think these instructions were properly refused.

The 8th was unimportant to the case in the view which this Court has taken of it. If the question, whether the survey, purporting to bear date in September, 1795, was really made on that day, or was antedated, had been the question to be decided by the jury, as it would have been had this paper been laid before the board of commissioners, the Court did right in refusing to grant this prayer. It seems to request the Court to say, that, in deciding on the verity of a paper alleged to be fraudulent, the paper itself is entitled to more credit than the parol testimony which impeaches it, though the law declares parol testimony to be admissible.

On the other points, the Court gave the instruction asked by the plaintiff in error.

We think the plaintiff in error has neither brought himself within the articles of agreement between the United States and the State of Georgia, nor within the acts of Congress; and that the judgment of the District Court must be affirmed. with costs.