## Doe *ex dem.* Nevitt *v.* Beaumont *et al.*

It is now well settled, that the Spanish government never had a right of soil in this country above the thirty-first degree of north latitude.

A title to land confirmed by a Spanish grant, legally and fully executed, is superior to a title under a Spanish warrant or order of survey, confirmed by the board of commissioners.

Those who held Spanish grants legally and fully executed, and were residents of the Mississippi territory on the 27th of October, 1795, were secured in them by the articles of session, and a confirmation of the board of commissioners was not necessary to their validity.

IN ERROR from the circuit court of the county of Adams.

The lessor of the plaintiff claimed title under a Spanish warrant of survey, older in date, than the defendant's full grant. After the plaintiff had closed his testimony, the defendants offered in evidence a notice of a Spanish claim by Stephen Minor, presented to the board of commissioners, of a tract of land by virtue of a complete Spanish grant in favor of Richard Harrison, dated March, 1783, which exhibited a plat of the ground. This instrument recited, that Harrison sold his claim to Minor, in 1788, and that the claim was for three hundred and fifty-nine arpents, of which Minor sold three hundred to the government, and was confirmed in the balance fifty-nine arpents by the board of commissioners, on the 16th day of May, 1806. The defendants also offered in evidence a Spanish grant to Stephen Minor, signed by the Baron de Carondelet, dated 16th March, 1795. The certificate of survey and grant stated the quantity of land to be one thousand one hundred and fourteen square arpents; attached to it was a certificate of confirmation of the board of commissioners, dated 13th January, 1806, which described the land as eight hundred and seventy-five and sixty-three-one hundredths of arpents, situated in Adams county, on the river, claimed by virtue of a Spanish grant for one thousand one hundred and fourteen arpents,

Doe *ex dem.* Novitt *v.* Beaumont *et al.*

and which was confirmed for eight hundred and seventy-five and sixty-three-onehundredths of arpents. It was admitted that the land claimed was embraced by the titles of both plaintiff and defendants. The plaintiff's titles were not set out in the bill of exceptions; but it was said in argument, and inferred from the instructions of the court, to be a Spanish warrant, or order of survey, older than the complete grant of the defendants, and also confirmed by the board of commissioners. The defendants' counsel moved the court to instruct, that a title to land, confirmed by virtue of a Spanish grant, legally and fully executed, is superior to a title under a Spanish warrant, or order of survey, confirmed; and if the jury believe the defendants' claim title, and have proved a confirmation of title under a Spanish grant, legally and fully executed, and the plaintiffs have no other title than a confirmation of a Spanish warrant or order of survey, they must find for defendants. Second. That the confirmation to Stephen Minor of a less number of acres than are mentioned and called for in the grant, without specifying that such confirmation is for a part of the land embraced or described in the grant, is a confirmation of the title to the whole tract of land called for in the grant. These instructions were given to the jury, to which plaintiffs excepted.

Verdict and judgment for the defendants. Writ of error to this court. The error assigned is, the instructions given by the court below.

Winchester, for plaintiff in error.

The questions for decision of this court upon the errors assigned, are—

First. Is a younger Spanish grant, confirmed under the articles of cession and agreement between the United States and Georgia, a better title in ejectment, than an older warrant of survey, confirmed under the act of Congress of 1803?

Second. Is a confirmation of 59 arpents, contained in a Spanish grant of 359 arpents to a claimant claiming only 59 acres by virtue of such grant, and of 875 59-100 arpents, part of a grant of 1114 arpents, a confirmation to such claimant of the whole 359 and 1114 arpents?

Doe *ex dem.* Nevitt *v.* Beaumont *et al.*

As to the first question:

First.    The perfect Spanish grants described in the articles of cession and agreement, and the imperfect grants by warrant of survey described in the first section of the act of 1803, become valid legal titles solely by force of their confirmation by the act of 1803. That act is the law, or national deed of confirmation, and the certificates afterwards granted by boards of commissioners and by patents from the president are only evidences of confirmations by that act.    By the treaty with Georgia, the nation agreed that they would confirm the complete grants therein described; and by the act of 1803, they did confirm them, and by one and the same act also confirmed the imperfect grants described in the first section of that act.    Both, therefore, derive their confirmation, and thereby their vitality as titles, from their origin under the Spanish laws and government, from the force of the act of 1803.

The first section enacts, that any person or persons " who were resident in the Mississippi Territory on the 27th October, 1795, and who had prior to that day obtained, either from the British government of West Florida, or from the Spanish government, any warrant or order of survey, &c." " shall be confirmed in their claims to such lands, in the *same manner as if their titles had been completed.*"

This section places those persons who had obtained a warrant or order of survey on the 27th of October, 1795, on equal ground with those whose titles were completed, provided the Indian title was extinguished, &c.

Henderson *v.* Poindexter, 12 Wheat. 536, N. Y Ed. of 1827; 6 Peters.

" Our constitution declares a treaty to be the law of the land. It is, therefore, to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself, without the aid of any legislative provision.    But when the terms of the stipulation import a contract, where either of the parties engage to perform a particular act, the treaty addresses itself to the political, not the judicial department, and the legislature must execute the contract before it can become a rule of court."

"The article under consideration does not declare that all the

grants made by his Catholic Majesty before the 24th of January, 1818, shall be valid to the same extent as if the ceded territories had remained under his dominion. It does not say, those grants are hereby confirmed." "Its language is, that those grants shall be ratified and confirmed to the persons in possession, &c. By whom shall they be ratified and confirmed? This seems to be the language of contract; and if it is, the ratification and confirmation which are promised must be the act of the legislature." Foster and Elam *v.* Neelson, 2 Peters, 314. This decision is reaffirmed by the supreme court, in Garcia *v.* Lee, 12 Peters, 519, the chief justice says, "afterwards, in the case of the United States *v.* Percheman, 7 Peters, 86, in reviewing these words of the eighth article of the treaty, the court, for the reasons there assigned, came to a different conclusion, and held that the words used were words of present confirmation by the treaty, where *the lands had been rightfully granted before the cession;* and that did not need the aid of an act of congress to ratify and confirm the grant." (And why? Because being already good and valid titles to land, the private property of individuals, they were valid, independent of the treaty, and without any confirmation; as. a change of sovereignty does not destroy rights of private individuals to private property in lands or goods.) The chief justice continues, "this language was, however, applied by the court, and intended to apply to grants made in a territory which belonged to Spain at the time of the grant. The case before the court was of that description." "But they do not, in any part of the last mentioned case, apply this principle to grants made by Spain within the limits of Louisiana, in the territory which belonged to the United States acording to its true boundary, and where Spain had no right to grant lands after the cession to France by the treaty of St. Ildefonso in 1800," &c.

So in the case of Georgia, it would be absurd to suppose that either party to the articles of agreement and cession meant to admit that Spain had a right to grant the lands, and that the titles mentioned in the 4th section were valid titles, and recognized as such by the treaty, and therefore needed no act of legislation to give them validity, when both governments had always denied the right of Spain to grant away the public domain, and for that rea-

Doe *ex dem.* Nevitt *v.* Beaumont *et al.*

son her grants are expressly decided to be void in the case of Poindexter *v.* Henderson, and so of British grants after the declaration of independence, in Gilliard's heirs *v.* Harcourt, 12 Wheaton.

The confirmation of both titles, the perfect grant, and the imperfect grant or order of survey, being by force of the act of 1803, they are on an equal footing as far as regards their confirmation, both being confirmed by the same act. A confirmation, by its very nature and meaning, relates back to the thing confirmed. It is in neither case of the perfect or the imperfect title, a grant from the United States to the persons having those titles; but it is a confirmation of the grant contained in those titles. It recognises those titles to be good and valid grants, whether perfect or imperfect, from their origin in the laws and acts of the Spanish government. The claimants by imperfect titles are expressly, by the words of the first section, "confirmed in the same manner as if their titles had been completed." How completed? Completed as the perfect grants had been completed, that is, by the Spanish government, and under the laws of Spain. The confirmation admits their validity under the laws of Spain, as they existed in the territory at the time the governor issued the grants; it admits his authority to issue them; it admits their regular transfer from the original grantee to the claimant confirmed, whether these transfers were by deeds executed according to the laws of Spain, by judicial condemnation or sales, by laws of descent, or by any other mode known to the laws, usages, and customs of the territory while in the possession of Spain as a government *de facto.* It consequently gives effect to these titles, and that effect is the same which is given to them by the laws of the Spanish sovereign.

"The production of an imperfect grant, concession, warrant, and order of survey, is legal evidence, from which the legal presumption arises, that all preceding acts necessary to give it legal validity have been done before it issued." 6 Peters, 731; 1 Peters, 669.

Third. Under this equal confirmation of both titles, looking back to the laws of Spain under which they originated, which is the best confirmed Spanish title, the oldest or the youngest?

This is easily settled by authorities. The oldest title is the best title in ejectment. First. Because it was such a title as would entitle the person holding it to the ownership and possession of it

21*

in the Spanish tribunals, under the Spanish laws, against any younger grant of the same land, the Spanish governor having no right to grant the land after it had been once granted; and hence it must be a good legal title to hold or recover the land upon a change of the sovereign. It was early decided in this state, when the character of the Spanish warrant of survey under the Spanish laws was well understood by living witnesses and the courts of the state, that it was such a title as gave a legal seisin to a husband, of lands, and therefore his wife was entitled to her dower in the land under our statute. " The act of congress, and the proceedings of the board of commissioners, constitute in themselves a perfect title, which cannot be revoked by the government itself." " It is the act of congress which constitutes the title, indestructible even by the government itself, as well before, as after the emanation of the patent, which is only one evidence of title, but not the only one." Hacklen's heirs *v.* Cabel, Walker's Rep. 97. The principle of that decision applies as well to certificates of confirmation of warrants of survey, as to donation certificates, and has been recognized ever since. Ejectments have at all times been maintained upon certificates without patents, and Howard's Reports are full of such cases, in which it has never been questioned but they are good legal titles on which to maintain an ejectment. "This court having recently, in the case of Hacklen's heirs *v.* Cabel, had occasion fully to examine the character of the titles granted to donees by the act of the 23d of March, 1803, and that of the 27th of March, 1804, supplemental thereto; and being of opinion that the same reasoning and principles will apply to such as hold under a Spanish order of survey, will not again go over the grounds occupied by their opinions in that case, but adopting its deductions, refer to them as the basis of their present conclusions, and shall consider the right of the ancestor, and the present plaintiffs below to be such legal rights, as is sufficient, so far as may depend on its legal character, as contradistinguished from its equitable one, to warrant a recovery in ejectment." Winn *v.* Cole's heirs, Walker, 123. See also 6 Peters, 768; 69 and 12 Peters, 452, Strother *v.* Lucas. It being a good legal title, and the oldest, it is the best title. " No grants shall be made of the rights, revenues, or municipal domain of villages; and all grants thereof made by the king

shall be void." 12 Peters, 445. "As such lands only were authorized to be offered for sale, as had not been appropriated by the previous sections of the law, and certificates granted by the commissioners in pursuance thereof, it follows incontestibly, that the right of the plaintiff in ejectment, derived from a donation certificate, is superior to that of defendant, derived from a purchase at the sales," &c. Ross *v.* Doe ex dem. Barland, 1 Peters, 662. "A government is never presumed to grant the same land twice." 6 Peters, 738, cites 7 Johns. Rep. 8. "Thus a grant even by act of parliament, which conveys a title good against the king, takes away no right of property from any other; though it contains no saving clause, it passes no other right, than that of the public, although the grant is general of the land." Idem. cites 8 Co. 2746; 1 Vent. 176; 2 Johns. Rep. 263.

"If land is granted by a state, its legislative power is incompetent to annul the grant, and grant the land to another; such law is void," Fletcher *v.* Peck, 6 Cr. 87, "and can not impose a tax on land exempted from taxation by the grant;" 7 Cran. 164, "nor take away a corporate franchise;" Dartmouth College *v.* Woodward, 4 Wheat. 518; see 6 Peters, 738.

Starke's heirs *v.* Mather is fully sustained by these decisions. Starke's title was merely a warrant of survey, never confirmed, because he had been put out of the possession. Mather's was a complete Spanish grant confirmed under the Georgia treaty, but issued by the Governor, after the warrant of survey, without the consent of Starke. The court decreed the title of Mather void as against Starke, and that Mather should convey to Starke's heirs. Walker's Rep. On appeal to the supreme court, it was decided that the decision sustaining this equity was no decision against the right of Mather by force of the treaty. See statement of the title, Walker, pages 185, 186. And this decision is further supported by the following cases, and was adopted by the high court of errors here, in the case of Iler *v.* Routh, which, but for the statute of limitations, would have been decided in favor of Iler. "Things which the king gives, he cannot take away without some fault of the donee." 12 Pet. 444. "Whatever doubts on common law principles might have existed on this question, whether the court can go behind the patent for lands, and examine the equity

asserted in a bill claiming the land against the patent; in Ohio and Kentucky this question has long been judicially settled, and this court, following the decisions of these states, have also decided it. 15 Peters, 93, cites 5 Cranch, 196; 9 Cran. 93; 5 Wheat. 293; 7 Wheat. 1; and 7 Wheat. 212.

Second: It is the best title, because the act of confirmation of 1803, legalized the confirmed warrant of survey, and relating back to its origin rendered it originally valid, and by discharging it of all conditions made it, in express words, a perfect title.

As to the second question on the errors assigned.

The confirmation of the 59 and 875 59-100 arpents to Minor as claimant of each of these number of arpents only, under the grant to Harrison and himself, cannot be construed a confirmation to him of the whole three hundred and fifty-nine and eleven hundred and fourteen acres. Minor's petition shows he had conveyed back to the Spanish government three hundred acres of the Harrison grant. It might have been because they conflicted with the warrant of survey of Nevitt. How often is it, that four or five different owners of separate parts of one tract by original Spanish grant, by several purchases from the original grantee, have each been confirmed to his several portion. If the one who obtained a confirmation of his part the first were thereby entitled to the whole, it would be strange construction. "Public grants convey nothing by implication, they are construed strictly in favor of the king." Dy. 362; Cro. Car. 169. "Though such construction must be reasonable and such as will make the true intention of the king as expressed in his charter, take effect, as is for the king's honor, and stands with the rules of law." 4 Com. Dig. 428, 554; G. 12; 10 Co. 65.

"Judges will invent reasons and means to make acts according to the *just* intent of the parties, and to avoid wrong and injury, which by rigid rules might be wrought out of the act." Hol. 277. The words of a grant are always construed according to the intention of the parties as manifested in the grant by its terms, or by reasonable and necessary implication, to be deduced from the situation of the parties, and of the thing granted, its nature and use. 6 Mars. 334; 5 S. & R. 110; 1 Taunton 495, 500, 502; 7 Man. 6; 1 B. & P. 375; 2 J. R. 321–2; 6 J. R. 5, 10; 4 J. R. 498–9; 3 E.

Doe *ex dem.* Nevitt *v.* Beaumont *et al.*

15; Cro. Car. 17, 18, 57, 168, 169; Plo. 17067; E. 621; Cowper, 360; 4 Yeates, 153.   See 6 Peters, 738.

Montgomery for defendants in error.

It must be taken for granted, as the plaintiff has not made his title a part of the record, that he held under the kind of title mentioned in the instruction, to wit, a Spanish warrant of survey, confirmed.

There can be no doubt, under the articles of agreement and cession between the United States and Georgia, that a Spanish grant legally and fully executed, when claimed by a resident of this territory, of 1795, is a complete legal title, paramount to any other title, (except the holder of a British grant) and when confirmed by the board of commissioners, amounts to a superior title to any title derived from the United States, or which derives its validity from an act of congress.   Revised Code, 503; Alex. Martin *v.* King's heirs;  3 Howard's Rep. 125.

The plaintiff's title owes all its validity to an act of congress passed 3 March, 1803; Howard & Hutch. 743.  By this act, on proving his claim to the satisfaction of the commissioners, they granted a certificate that he was entitled to a patent.  The legal title remained in the United States until the patent issued.  The defendant's title did not require a patent; Howard & Hutch. 746; Rev. Code, 505.

The treaty was a contract, and congress was bound to confirm the Spanish grant; the confirmation of a warrant was a gratuity; Foster and Elam *v.* Neilson, 2 Pet. Rep. 314;  7 Pet. Rep. 51.

The second point is equally free from difficulty.  The act of congress requires the claimant to deliver a notice to the register, of his claim, with a plot of the tract or tracts claimed; Howard & Hutch. 744, sec. 5.   Under this act it was the duty of the claimant to have his land surveyed, and to petition for the confirmation of his claim to the extent really embraced in his claim.  And the presumption is, that upon a re-survey of Minor's claims, there was not as much land embraced within it, as was called for by his grant.

But it has been uniformly considered by courts, that the quantity specified in a grant is an immaterial part of the description.

Doe *ex dem.* Nevitt *v,* Beaumont *et al.*

The language of the certificate of confirmation extends to the whole grant, as it closes by saying, "having such shape and marks, natural and artificial, as are represented in the plat annexed to said grant." The certificate refers to the grant by its date, and the quantity of acres. And if it were only intended to confirm the title to a part of the land embraced in the grant, it is probable the language of the certificate would have been varied so as to show that intention. If the land claimed by the plaintiff was excepted out of the grant, the plaintiff should have shown it; but, on the contrary, it is "admitted that the land is embraced by the titles of both plaintiff and defendants." This admission puts the question to rest. Even if one title is for only a part of the land embraced in the Spanish grant, the admission is, that the land is embraced by that *title.* 3 Caine's Rep. 493; 3 How. Rep. 125; 15 Johns. Rep. 471; 17 Johns. Rep. 146; 2 Bin. Rep. 523; 1 Bin. R. 246.

It was admitted that defendants title embraced the *locus in quo.* It is admitted that where the land has been rightfully granted, the words of the treaty will be considered a valid title, without ratification by treaty.

This case in 12 Peters, 519, is clear in favor of defendants. Georgia was unquestionably the owner of Mississippi, and if she confirmed those titles, and requires that the titles should be respected by the United States, such act on the part of Georgia must be considered as a general confirmation by her of all the claims which came within the provision of that section of the treaty. Rev. Code 503.

A certificate title of confirmation is only evidence of legal, so far as to enable the holder to maintain ejectment. Rev. Co. 123.

Courts in construing statutes, will never give such construction as will violate a treaty by which the government was bound.

The treaty with Georgia expressly provides, that in making appropriation of land to satisfy any other claims than those provided for in the treaty, the United States shall not interfere with the claims to land provided for in the treaty. Rev. Code, 503, sec. 3.

The case of Starke's heirs *v.* Mather's heirs cannot be applied to this case. That case was based on the fraud of Mather in obtaining a title to Starke's land. The case now before the court does not involve any such question. For all that appears before the

Doe *ex dem.* Nevitt *v.* Beaumont *et al.*

court, Minor was an innocent purchaser, without notice of the
equitable claim set up by plaintiff in error.   We do not contest the
position that the party who by fraud obtains a legal title to which
another was equitably entitled, will be held as a trustee for the
benefit of the person having the equitable title; but such *fraud*
will not be presumed, and there is nothing in this case which
serves to show it.

Boyd on the same side.

Mr. Chief Justice SHARKEY delivered the opinion of the court.

This is an action of ejectment instituted in the circuit court of
Adams county, by the plaintiffs in error, against the defendants in
error.   The questions for our determination arise out of two in-
structions given by the court to the jury, at the request of defend-
ants' counsel.   After the testimony was closed, the defendants'
counsel moved the court to charge as follows:   First.  "That a title
to land confirmed by a Spanish grant legally and fully executed,
is superior to a title under a Spanish warrant or order of survey
confirmed; and if the jury believe defendants' claim title, and have
proved a confirmation of title under a Spanish grant legally and
fully executed, and the plaintiffs have no other title than a confir-
mation of a Spanish warrant or order of survey, they must find
for the defendants; and, second, that the confirmation to Stephen
Minor of a less number of acres than are mentioned and called for
in the grant, without specifying that such confirmation is for a part
of the land embraced or described in the grant, is a confirmation
of the title to the whole tract of land called for in the grant."

The title of the plaintiffs is not set out, and we can only know
from the instructions given by the court, what kind of title was
shown.   It seems to have been a confirmed Spanish warrant, or
order of survey.

The defendants introduced a notice of a claim presented by
Stephen Minor to the board of commissioners west of Pearl river,
in which said Minor claimed three hundred and fifty-nine arpents
of land, as assignee of Richard Harrison, by virtue of a complete
Spanish grant to said Harrison, bearing date in March, 1783, ac-
companied by a map of the land.   They also presented the certi-
ficate of confirmation to Minor for fifty-nine acres of the land

claimed, the remainder having been sold by him to the government, which certificate bears date the 16th of May, 1806, and was given in conformity with the act of Congress of 1803. They also introduced a certificate of survey made by the surveyor general of the district of Natchez, dated the 6th of March, 1795, in which he certifies that he had surveyed for Stephen Minor, in compliance with a decree of the general government, eleven hundred and fourteen square arpents of land, situated in the district of Natchez, about four miles north-east of the fort. This land seems to have been surveyed for Minor in virtue of several different claims which had been acquired by him. The certificate of survey is also accompanied by a map. On this certificate of survey a Spanish patent was granted, which was also introduced with the certificate of confirmation by the board of commissioners. Thus it will be seen that the defendants relied on two Spanish patents to Minor, covering, as it appears by the maps, adjoining lands, but it does not distinctly appear which covers the land in controversy; it is admitted, however, that the land in dispute is embraced by the title of both plaintiff and defendants; it is therefore a matter of little consequence which of the defendants' patents includes it, both being titles of the same grade. There is no question about boundary, it is a question which depends on strength of title.

For the plaintiff, it is argued that his title is superior and should prevail, being an older warrant or order of survey under the Spanish government. It would be a sufficient answer to this position to say, that the plaintiff has not shown the date of his title, or the time of its confirmation by the commissioners; but assuming it to be an older warrant or order of survey, the question is, whether such a title is superior to a Spanish grant legally and fully executed? To enable us to solve this question, we must of course look back to the origin of the respective titles. That the Spanish government never had a right of soil above the thirty-first degree of north latitude, is no longer a debatable question. The treaty of 1795, by which the line between the United States and the provinces of East and West Florida was established or recognized at the thirty-first degree of latitude, was a mere settlement of territorial limits according to pre-existing rights. Spain did not cede any territory above the boundary then acknowledged, but admitted

Doe *ex dem.* Nevitt *v.* Beaumont *et al.*

that the territory above that parallel had previously constituted a part of the territory of the United States. As a consequence of this adjustment, it followed that the possession by Spain of the territory in which this land is situated was wrongful, and as Spain never had the right of soil, it was manifest that grants or titles derived from that government were invalid, for want of title in the granting power. Anterior to the date of these patents, and up to the year 1802, the right of soil was admitted to be in the state of Georgia; and of course titles originating during such ownership by Georgia possessed no intrinsic validity, unless they were acquired from the true owner of the soil. See Harcourt *v.* Gaillard, 12 Wheaton, 523; and Henderson *v.* Poindexter, 12 Wheat. 530. On the 24th of April, 1802, Georgia ceded the land which afterwards constituted the Mississippi territory to the United States.— By the second article of cession provision was made "that all persons who on the twenty-seventh day of October, one thousand seven hundred and ninety-five, were actual settlers within the territory thus ceded, should be confirmed in all the grants legally and fully executed prior to that day, by the former British government of West Florida, or by the government of Spain," and they were also confirmed in claims derived from actual survey or settlement made under an act of the legislature of Georgia for laying out a district of land situated on the Mississippi river, to be called the county of Bourbon, passed the 7th day of February, 1785.— By the third article it was provided that the land ceded, after satisfying the sum of one million two hundred and fifty thousand dollars to the state of Georgia, and the grants recognized by the preceding conditions, should constitute a common fund for the United States. This article contains a proviso, that the United States might, within one year after the assent of Georgia to the boundary established, in such manner as not to interfere with the payment to be made to the state of Georgia, "nor with the grants hereinbefore recognized, dispose of or appropriate a portion of the said lands, not exceeding five millions of acres, or of the proceeds of said five millions of acres, or of any part thereof, for the purpose of satisfying, quieting or compensating for any claims, other than those hereinbefore recognized, which may be made to the said lands or any part thereof." In legislating under

Doe ex dem. Nevitt v. Beaumont et al.

this proviso, Congress, in March, 1803, passed an act, by the first section of which persons who were resident in the Mississippi territory on the 27th day of October, 1795, and who had prior to that day acquired from the British government of West Florida or from the Spanish government any warrant or order of survey for lands lying within said territory, and which on that day were actually inhabited and cultivated by such person or for his use, should be confirmed in his or her claim to such land in the same manner as if his title had been completed, the claimant being at the date of his claim the head of a family, or above the age of twenty-one. The second section provided for a donation to actual settlers when the country was evacuated by the Spanish troops, and the third section secured pre-emption rights to actual settlers at the date of the act. The subsequent sections provided for the establishment of boards of commissioners for investigating claims, and the time and manner of their presentation and allowance. It will thus be plainly seen how the two titles originated.

The plaintiffs claim under an order of survey from the Spanish government. We have said that the Spanish government possessed no right to convey; the order of survey therefore passed no title. It possessed no intrinsic validity. Such titles, however, were recognized and directed to be confirmed by the act of 1803, and from that act alone do they derive their validity. Congress, under certain restrictions, had an undoubted right to confirm such titles, or rather to make donations to such claimants, in consequence of their pretended claims, and when their titles were thus recognized they became good and valid titles, having relation back to their inception, so as to cut out junior claimants who derived their titles from the same source. Let us then inquire whether it was competent for congress to place such titles on an equal footing with complete British and Spanish grants.

The United States acquired the right of soil in 1802, by cession from the state of Georgia; previous to which time the Federal Government had no right whatever to the soil. Such private rights as had been previously acquired from Georgia, were of course not divested or in any way affected by the cession, and it was competent for Georgia by the treaty to recognize the validity of such titles as she might think proper, and titles thus recognized were placed

Doe *ex dem.* Nevitt *v.* Beaumont *et al.*

beyond the reach of congress, except so far as power over them was expressly or impliedly given by the articles of cession. By those articles, persons who were actual settlers within the ceded territory on the 27th of October, 1795, were confirmed in all grants legally and fully executed, made prior to that day by the British government of West Florida, or by the government of Spain, and also in grants made under the Bourbon act. In this consists the superiority of the defendant's title. It was secured by the same treaty which passed the soil to the United States, and was in all respects equal to the title of the United States. The mere Spanish grant was not in itself a valid title, but it was made the basis of a title by treaty. The individuals who held such grants, and who were inhabitants of the territory in 1795 were confirmed in them; and not only were they confirmed, but their titles were made paramount to any that could be conferred by the United States, for although express power was given by the articles of cession to the Federal Government to appropriate five millions of acres of the ceded lands for the purpose of satisfying and quieting other claimants, yet such appropriation was not to be made so as to interfere with the grants recognized by the articles of cession. As the Spanish patent under which defendants claim was recognized by the cession, congress was prohibited by the proviso in the third article from making any appropriation of any part of the ceded territory which should interfere with it. None but actual residents were confirmed in these grants legally and fully executed. By the 5th sec. of the act of congress of 1803, all persons claiming lands by virtue of any British grant, or by the articles of cession, or by the three first sections of that act, were required to present a written notice of their claim to the commissioners, together with the deed, grant, order of survey, or other evidences of title, which were to be presented within a given time, and on failure the title was to be considered void. This, as chief justice Marshall observed, was rigorous legislation in regard to those who claimed under the articles of cession; but it is not necessary to inquire whether congress had a right to impose these restrictions on such claimants, as Minor did present his claim to the commissioners, who gave him a certificate of confirmation. As to claimants who had a patent, the commissioners had but two points to settle: first, was the grant

genuine or *bona fide?* and second, was the claimant a citizen of the territory on the 27th of October, 1795? both of which inquiries being affirmatively settled, the title became complete under the articles of cession. Even proof of these facts might perhaps have been equally effectual if made in a court of justice or elsewhere. The plaintiff then claims under an order of survey derived from the Spanish government, which had no validity as a title, until it acquired it under the act of the 3rd of March, 1803. The defendants claim under a Spanish grant which was recognized and guaranteed. as a perfect title by the articles of cession dated 24th of April, 1802. And not only was their title recognized and guaranteed prior in point of time, but it was so recognized to the exclusion of the plaintiffs title, for such is the declared object of the proviso to the third article of cession. It will not do therefore to say that the order of survey was anterior in date to the Spanish grant, and when it was confirmed it related back as a valid title to its date, for we have already seen that congress was prohibited from confirming any title which should interfere with such as were recognized by the articles of cession; or what is in effect the same thing, none of the ceded territory was to be appropriated so as to interfere with the payment to be made to Georgia, or with the title she had recognized. The act of 1803 which confirmed orders of survey which conflicted with Spanish patents, was therefore an illegal appropriation. We cannot therefore hesitate in saying that the defendants have shown a title superior to the plaintiff's.

It is scarcely necessary to say any thing in regard to the second instruction asked, since it is admitted that the land in controversy is covered by one or the other of Minor's patents. If therefore the first patent mentioned was only a title to fifty-nine acres, and the land is covered by it, it is sufficient. But the merits of the question are free from difficulty. Minor it seems presented a patent for three hundred and fifty-nine arpents, and was confirmed in his title to fifty-nine, the balance having been sold to the government. It was not the act of confirmation by the commissioners which gave him title. His title was above the action of the commissioners. It was recognized and secured by the articles of cession, and the commissioners could neither abridge or limit. They had but to inquire whether he had a Spanish grant legally and

Doe *ex dem.* Nevitt *v.* Beaumont *et al.*

fully executed, and whether he was a resident of the territory on the 27th of October, 1795. These things being settled in his favor, he needed not the confirmation of his title by the commissioners. He then had a prior and better confirmation than they could give him; and although by their certificate they may have professed to confirm him in his title, yet it is evident that such certificate was not for that reason a title. It conferred no additional right whatever. If he had sold part of the land, that was a question between him and his vendee, and the certificate so far as it professed to confirm his title, was a useless act.

The bill of exceptions in this case is imperfect, on the part of the defendants as well as on the part of the plaintiffs. The defendants have not proven a title under Minor, and the plaintiff has shown no title at all. We have therefore taken for granted what seemed to have been tacitly admitted, that the plaintiff introduced an order of survey under the Spanish government, and that the defendants derived title from Minor. If we had rejected such presumptions, the result must have been the same, as we could not set aside a verdict for the defendants in possession, when the plaintiff had shown no title.

The judgment must be affirmed.