[CONSTRUCTION OF TREATY. LOCAL LAW.]

HARCOURT and others *against* GAILLARD and others.

A grant made by the British governor of Florida, after the declaration of independence within the territory lying between the Mississippi and the Chatahouchee rivers, and between the 31st degree of north latitude, and a line drawn from the mouth of the Yazoo river due east to the Chatahouchee, is invalid as the foundation of title in the Courts of the United States.

This cause was argued by Mr. *White* and Mr. *Isaacks* for the plaintiffs, and by Mr. *Coxe* and Mr. *Worthington* for the defendants.[a]

*Feb.* 13t.

a. *Hall's Law Journ.* 412. 202. 430.   4 *Johns. Rep.* 163.

1827.

Harcourt
v.
Gaillard.

March 3d.

Mr. Justice JOHNSON delivered the opinion of the Court.

The questions upon which this cause turns arose out of a British grant to the ancestor of the plaintiff, dated the 24th of January, 1777.

The land in controversy is situated in that tract of country which lies between the Mississippi and Chatahouchee rivers, and between the 31st degree of north latitude to the south, and a line drawn from the mouth of the Yazoo river, due east to the Chatahouchee. From the earliest times of the settlement of North America, the region of territory in which that tract of country is described, was the subject of wars and negotiations with France, Spain, and Great Britain, until 1763, when Great Britain became the undisputed proprietor of the whole, from the lakes Maurepas to Ponchartrain, and the gulphs of Mexico and Florida, by the Mississippi northwardly. Before that time, her claim extended southwardly to the 29th degree of north latitude, as is evidenced by her charter to the lords proprietors of 1677; and from the same instrument it appears that she interfered with the province of Louisiana by extending her southern line to the Pacific ocean. The country of Florida, therefore, south of the 29th degree, was a conquest; that north of the 29th degree, and up the Mississippi, was held as a part of her own territory, concerning which her treaties with France and Spain only established a disputed boundary.

On the 7th of October, 1763, the king, exercising a right which was never questioned, over what were then called royal provinces, issued his proclamation, by which he established the northern boundary of the Floridas at the 31st degree of north latitude from the Mississippi to the Apalachichola, down that steam to its confluence with Flint river, and from that point by a line to the head of the St. Mary's, and by that river to the sea. And this was the line which, by treaty of peace, was established as the southern boundary of the United States. After the peace, the United States, Spain, South Carolina, and Georgia, succeeded to the disputes of Great Britain, France and Spain, relative to the same tract of country.

The original title of South Carolina, under the grant to the lords proprietors was unquestionable; and she contended that she had never been legally devested of soil or sovereignty.

Georgia founded her claim on the commissions to her governor Wright, which comprised, within its jurisdiction, the territory in question ; and the United States claimed it as a conquest from the British province of West Florida. While Spain insisted that it was a part of Louisiana or Florida, and as such, ceded to her by the treaty of 1783. Finally, South Carolina, by the treaty of Beaufort, relinquished her claim to Georgia, and the United States settled her claim by taking a cession from Georgia of the land in controversy ; so that, at present, the claims of the United States, of the State of South Carolina, and of Georgia, have become united in the general government.

The grant to Harcourt, it will be perceived from its date, was subsequent to the declaration of independence, and within the acknowledged limits of the United States ; it, therefore, involves the question whether such a grant can be valid ; a question which would have been involved in less difficulty, if the United States had never set up the claim of conquest. That ground would admit the original right of the governor of West Florida to grant, and if so, his right to grant might have continued in force until the treaty of peace : and the grant in that case to Harcourt might have had extended to it the benefit of those principles of public law which are applicable to territories acquired by conquest; whereas, the right set up by South Carolina and Georgia deny all power in the grantor over the soil ; the question which they present, is one of disputed boundaries, within which, the power that succeeds in war is not obliged to recognise as valid any acts of ownership exercised by his adversary.

There are several reasons for putting the claim of the United States out of the question. She has abandoned it, and it is very clear, could never have sustained it. The very ground on which she denied the capacity of Spain to conquer, or take by cession, the territory on the Mississippi, was fatal to the pretensions set up by her against Georgia and South

Carolina, to wit, that Spain could not acquire by conquest a territory within the limits claimed by an ally in the war.

But there was another reason. There was no territory within the United States that was claimed in any other right than that of some one of the confederated States; therefore, there could be no acquisition of territory made by the United States distinct from, or independent of some one of the States.

We are then referred to the belligerent rights of South Carolina and Georgia; and it is immaterial to the question here, to which of those States the territory apper.ained. Each declared itself sovereign and independent, according to the limits of its territory, and both extended their claims of territory to the 31st parallel of north latitude. There is no evidence that either, at that time, had acquiesced in the extension of the territory of Florida beyond that line.

The facts upon which the right of the governor of Florida to issue grants beyond the 31st degree of north latitude rested are these: After the proclamation of 1763, the board of trade of Great Britain, which, at that time, had the affairs of the colonies committed to them, passed a resolution, of the date of March, 1764, in which they advise the king to extend the limits of West Florida up to a line drawn from the mouth of the Yazoo, east to the Chatahouchee. It does not appear that the king ever made an order adopting this recommendation. No proclamation was issued in pursuance of it; but it appears that, from that time, the commissions to the governors of West Florida designated that line as the northern limit of that province; notwithstanding which, governor Wright continued to preside over Georgia under his commission of 1763, which embraced in its limits the whole of that country, bounded south by the 31st degree of north latitude. Thus stood the rights of the parties at the commencement of the revolution, and when, by the treaty of peace, the southern boundary of the United States was fixed at the ancient boundary of South Carolina or Georgia, (it matters not which,) Georgia insisted on that line as the limit which she was entitled to, and which she had laid claim to when she declared herself independent; or which the United States had asserted in her behalf in the declaration of independence. But as there had been nothing very unequivo-

cal done at the time of the declaration of independence, as to designating the limits of the United States, it is still contended, that the tract of country in which the grant lies had been legally separated from Georgia before the revolution, and attached to West Florida ; and that, therefore, a grant by the governor of the latter province was valid, if made at any time previous to the treaty of peace.

Two questions here occur, first, whether this separation had taken effect by any valid act ; and secondly, if it had, whether it made any difference in the case upon international principles.

On both these points, we are of opinion that the law is against the validity of this grant. It is true, that the power of the crown was at that time admitted to be very absolute over the limits of the royal provinces; but there is no reason to believe that it had ever been exercised by any means less solemn and notorious than a public proclamation. And although the instrument by which Georgia claimed an extension of her limits to the northern boundary of that territory, was of no more authority or solemnity than that by which it was supposed to have been taken from her, it was otherwise with South Carolina. Her territory had been extended to that limit by a solemn grant from the crown, to the lords proprietors, from whom, in fact, she had wrested it by a revolution, even before the rights of the proprietors had been bought out by the crown.

But this is not the material fact in the case; it is this, that this limit was claimed and asserted by both of those States in the declaration of independence, and the right to it was established by the most solemn of all international acts, the treaty of peace. It has never been admitted by the United States, that they acquired any thing by way of cession from Great Britain, by that treaty. It has been viewed only as a recognition of pre-existing rights, and on that principle, the soil and sovereignty within their acknowledged limits, were as much theirs at the declaration of independence as at this hour. By reference to the treaty, it will be found, that it amounts to a simple recognition of the independence and the limits of the United States, without any language purporting a cession, or relinquishment of

1827.

Harcourt
v.
Gaillard.

1827.

Harcourt
v.
Gaillard.

right, on the part of Great Britain. In the last article of the treaty of Ghent, will be found a provision respecting grants of land made in the islands then in dispute between the two States, which affords an illustration of this doctrine. By that article a stipulation is made in favour of grants before the war, but none for those which were made during the war.

And such is unquestionably the law of nations. War is a suit prosecuted by the sword; and where the question to be decided is one of original claim to territory, grants of soil made *flagrante bello* by the party that fails, can only derive validity from treaty stipulations. It is not necessary here to consider the rights of the conqueror in case of actual conquest; since the views previously presented put the acquisition of such rights out of this case.

The remaining question is, whether the parties plaintiffs have been established in their rights by any act or treaty of the United States.

The treaty of peace contains no stipulation in their favour. Nor does the treaty with Georgia, since all the reservations there made in favour of British or Spanish grants, and inchoate titles, are expressly confined to the case of actual settlers. But the spontaneous bounty of the United States has gone further, and confirmed a great variety of questionable titles, emanating from British and Spanish authority.

Is this one of the titles embraced within the provisions of the statutes passed upon this subject? It is obvious that it is not.

It is true, that the act of the 3d of March, 1803, although making no express provision in favour of British or Spanish grants unaccompanied with possession, does seem to proceed upon the implication that they are valid; recognising the principle that a change of sovereignty produces no change in individual property; yet it imputes to them only a modified validity, since by the 5th section it imposes a positive necessity upon the proprietors to record such grants, and makes expressly void, all the rights claimed under the three first sections of that act, or the Georgia treaty, if the duty so imposed be not complied with. And with regard to all

1827.

Harcourt
v.
Gaillard.

other evidences of title not recorded in the time limited, declares, that they shall never be admitted in evidence against any grant *derived from the United States.*

The first section of the supplementary act of 27th of March, 1804, extends the time for recording British grants, and vests in the board of commissioners a power of examining, and confirming the claims. to be filed under its provisions, as extensive as that given by the previous act over the rights claimed under the cession from Georgia, or the three first sections of that act.

But the grant to Harcourt appears neither to have been recorded, nor passed upon by the commissioners; it has, therefore, nothing to claim from the bounty of the United States; and that provision in the 5th section of the act of 1803, which forbids its being received in evidence as against American grants, would certainly have operated against it in any case clearly within the provisions of that act. Here, it is contended, that the Court anticipated the question, and rejected the grant, before it was possible that the question could arise, whether the same land had passed under an American grant.

On this subject, it must be observed, that neither of the acts of 1803, or 1804, contains an express recognition of the validity of any British grants beside those which were accompanied with possession; and, for that reason, coming within the Georgia treaty, and those which should be confirmed by the commissioners under the first section of the act of 1804, with regard to which there seems to be a very general power given to that board. All others must rest upon their validity according to the principles of the modern law of nations. Upon these principles, it has been shown, that the grant to Harcourt was invalid, and, if so, it was not admissible as evidence to sustain the plaintiff's action under any circumstances. The rule, therefore, applies to this case, that a plaintiff must recover by the strength of his own title, not the weakness of his adversary's; for which reason, we think the grant was properly rejected, and that the judgment below must be affirmed, with costs.