Mr. Justice Clayton
delivered the following opinion.
This is an action of ejectment to recover land in the county of Jefferson, on which the town of Rodney is situated. The plaintiffs in the court below claim title under a grant made by the British governor of West Florida, on the 11th of February, 1772, which was confirmed by the board of commissioners on the 11th of July, 1805. The defendants claim under a grant from the Spanish government, bearing date 20th of March, 1795, and which was likewise confirmed by the board of commissioners, the 5th of June, 1805. In the circuit court there was a verdict with judgment for the plaintiffs.
It will not be necessary to pass upon all the points made in the very luminous, argument of the cause, and we shall only consider such as conduce to illustrate our conclusion.
In support of the judgment below, it is insisted, “ that the British patent to Campbell of 1772 was valid in itself, and vested a perfect title to the land in controversy, independent of the treaty of cession, or the confirmation by the board of land commissioners in 1805.” It is urged that this follows from the fact, that the land thus granted lay within the legal boundaries of the province of West Florida, by whose governor the patent was issued in 1772.
*169 It may be well to remark in the commencement, that none of the cases decided in the supreme court of the United States, or of this state, come fully up to the point here presented. In other words, there is a material difference in the facts. In the case of Harcourt v. Gaillard, 12 Wheat. 523, the grant was made by the British governor of West Florida, on the 24th of January, 1777, during the revolutionary war, and after the declaration of independence. The grant was held to be invalid. In its opinion the court says: “It has never been admitted by the United States, that they acquired any thing by way of cession from Great Britain, by the treaty of peace. It has been viewed only as a recognition of pre-existing rights, and on that principle, the soil and sovereignty within their acknowledged limits, were as much theirs at the declaration of independence, as at this hour.” . . . “War is a suit prosecuted by the sword; and where the question to be decided is one of original claim to territory, grants of soil made flagrante bello by the party that fails, can only derive validity from treaty stipulations.” The turning point of this decision was, that the grant was made, after the declaration of independence.
In the case of Henderson v. Poindexter's Lessee, 12 Wheat. 530, the defendant gave in evidence a Spanish grant, bearing date 20th of June, 1795. The grant was of land north of thirty-one degrees of north latitude. The court held, that “the grant had no intrinsic validity, and must depend for its efficacy exclusively on the laws of the United States. This grant was made before the treaty of 27th of October, 1795, by which the southern boundary of the United States was fixed at latitude thirty-one degrees, north. That treaty was understood not to be a cession of territory by Spain, but an admission that the right was originally in the United States.”
The case, therefore, is not exactly similar to the one before us. The grant was after our revolution. In the present case, the grant was made at a time when the sovereignty was in Great Britain, whether the land lay in Georgia or in Florida; though, if in the former, the governor of West Florida had no right to issue a patent for it. The same is true in reference to *170 the case of Doe ex dem. Nevitt v. Beaumont, 6 How. Miss. R. 237. The defendant claimed under a Spanish grant, dated March, 1783. It was held to be well settled, that the Spanish government never had a right of soil above the thirty-first degree of north-latitude. But that those who held Spanish grants legally and fully executed, and who were residents of the Mississippi territory on the 27th of October,- 1795, were secured in them by the articles of cession ; and that, as to such claimants, the commissioners had but two points to settle; “first, Was the grant genuine or bond fide? and, second, Was the claimant a citizen of the territory on the 27th of October, 1795 ? Both of which inquiries being affirmatively settled, the title became complete under the articles of cession.”
These cases show, that a British or Spanish grant, made after the declaration of independence for land north of thirty-first degree, north latitude, was invalid; but do the principles they establish apply to British grants before that period? That is the question before us. -Before . the revolution the power to make grants of land, within the royal colonies, pertained to the crown. That power was .generally deputed to the governor of the respective provinces. . Had this grant been made, by the English monarch himself, there would have been little question of its validity, because he had the power to make grants either in Georgia or in Florida. As, however, it was made by the governor of West Florida, the inquiry, deemed very important in the argument, arises, whether the land lay within the bounds of his province. To that we shall first turn our attention.
By the treaty of peace concluded between Great Britain and the United States, in 1783, at the end of the war of the revolution, Great Britain acknowledged the southern boundary of the United States, to be the thirty-first degree of north latitude. The boundaries were particularly described. By a treaty made between Great Britain and Spain, about the same time, the Floridas were ceded to Spain, without 'any description of boundary-This occasioned a lotig controversy between Spain and the United States, as to the boundary of Florida, which was ended by the treaty of the 27th October, 1795, just as it was about to *171 give rise to another war. This treaty agrees that the line which was described in the treaty between Great Britain and the United States, as their southern boundary, shall be the line which divides their territory from East and West Florida. The article does not import a cession of territory, but is understood as an admission, that the right was originally in the United States. By these two treaties in connection, the southern boundary of the United States was recognized to have been the thirty-first degree of north latitude. Henderson v. Poindexter’s Lessee, 12 Wheat. 534.
After the war of 1756, by the treaty concluded in 1763, Spain ceded to Great Britain, Florida, Fort St. Augustin, the Bay of Pensacola, and all that she possessed on the continent of North-America, to the east or south-east of the river Mississippi. At the same time, France also ceded to Great Britain the whole of New France, and all of that portion of the province of Louisiana, lying upon the east side of the Mississippi river, except the island of New Orleans. Great Britain, by these concessions, became the owner, subject to the Indian right of occupancy of all the land between the Mississippi river, and the Atlantic ocean.
Now the question as to her rights and power in this vast extent of territory, before the declaration ■ of Independence, is very different from what it became after that time. After that time, she had, as we have seen, no right to make grants of land; before that event she had. Is this a case in which this right was properly exercised by her governor of West Florida? This question turns mainly upon the bounds of that province, at the date of the grant, in 1772.
Georgia was originally a proprietary government, but in 1752, its charter was surrendered to the crown, in consequence of which, it became thenceforward a royal colony. Florida-was ceded in virtue of its conquest, and was likewise a royal colony. Between the royal and proprietary colonies, there was a very material distinction.
In regard to royal provinces, the crown retained both the right of soil, and of jurisdiction. Their boundaries were subject to alteration at its pleasure, aud in practice they were changed as *172 often as inclination or policy directed. The king claimed and exercised the right of granting lands, and of dismembering the government at his will. Johnson v. McIntosh, 8 Wheat. 579.
In the proprietary governments, the right of soil, as well as jurisdiction, was vested in the proprietors. Their charters were in the nature of grants; and their limits being fixed by these charters, could not be altered, but by their own consent. These were their rights, but, in point of fact, they were not always respected by the crown.
The power to change the boundaries of the royal provinces seems to be conceded, and is indeed unquestionable. The mode in which the power was to be exercised, is a matter of more doubt. In the case of Harcourt v. Gaillard, 12 Wheat. 527, the court says, “ there is no reason to believe that such power had ever been exercised by any means less solemn and' notorious, than a public proclamation.” But it goes on to add, “ this is not the material fact in the case.” By others, it has beep thought, that the crown had the right to exercise the power in any way it thought fit.
By a royal proclamation issued very soon after the treaty of Paris, and bearing date 7th October, 1763, the northern boundary of West Florida was placed at a line drawn due east from that part of the Mississippi, which lies thirty-one degrees north latitude. This line was thus the boundary between that province and Georgia. By a commission to James Wright, as governor of Georgia, on the 20th of January, 1764, the bounds of Georgia were defined “to extend along the north boundary line of Florida, westward, as far as the British territories extend,” which was to the Mississippi river. On the 23d of March, 1764, the board of trade in England, which was intrusted with the management of the affairs of the colonies, represented to the crown, “ that it would be well to alter the bounds of West Florida, by an instrument under the great seal, which should declare that province to be bounded on the north by a line drawn from the mouth of the river Yazoo, where it unites with the Mississippi, due east, in order to comprehend settlements.” By a commission to Peter Chester, as governor of West Florida, dated the 2d of March, 1770, the *173 boundaries of the province were declared to be altered, so as to correspond with that representation, and to extend north, to the mouth of the Yazoo river. Whether the change was made, prior to that time, in the commissions of Johnson, or of Elliot, is, in this case, a matter of no practical importance. 1 Lourie, State Papers, 28, 44; 5' Hall, Law Journal, 412. Monette says, “ the British cabinet extended the limits of Florida, in 1764, -to the mouth of Yazoo,” but he cites no authority for his position. Hist. Valley Miss. Vol. 1, p. 77.
Did this extension of the boundaries, by commission, give to the British governor of West Florida the right to make the grant in question ? The supreme court of the United States, as we have seen, thought that some act more solemn than the commission, was necessary to produce this effect. 12 Wheat. 527. This opinion does not seem to amount to a decision in the case, and we should incline to the belief, that the power might as well be exercised in the shape of a commission, as in any other way. We have been pointed to no limitation, as to the manner of its exercise. In 1496, the king, Henry VIL, granted a commission to the Cabots, to discover countries unknown to Christian people, and to take possession of them in the name of the king of England. Under this commission, Cabot discovered the continent of North America, and proceeded along the coast, as far south as Virginia. To this discovery, the English trace their title on this continent. 8 Wheat. 576. If a discovery under a commission was a sufficient foundation of title, to all the subsequent acquisitions of the crown, it would seem to follow, that the boundaries of one of the royal provinces might be changed in the same way. Yet it must be admitted, that the exercise of this power, in any form, gave rise to great dissatisfaction in the colonies, and it was by no means confined to its legitimate objects. The exercise of the power was one of the matters complained of in the declaration of independence, and in the address to the people of Quebec. The power was denied by Virginia, in its constitution, and by North Carolina, in her declaration of rights. See 6 Cranch, 117. It is well known that the life and fortunes of William Penn were well nigh spent, in fruitless and unavailing *174 controversies with the crown, in regard to his government of Pennsylvania. William III., by his own power, constituted Maryland a royal government, though it had been a proprietary government, by grant to Lord Baltimore. This arbitrary act was sustained by a legal opinion from Sir John Holt. 3 Bancroft, 31, 44. In this uncertainty, as to the limit and extent of the royal prerogative, it is a relief to find, that a correct decision of this cause, does not require the authoritative determination of this point.
Let us reeur to the proclamation of George III., already referred to, as having been made on the 7th.of October, 1763. 5 Hall, Law Journal, 405 ; 1 Lourie, State Papers, 30. By that proclamation, four distinct and separate governments were created and established within the countries and islands, then recently ceded and confirmed to Great Britain, by the treaty of Paris. These were Quebec, East Florida, West Florida, and Grenada. The limits of each of these were precisely defined. We have no concern with any of them but West Florida, and of this, it is enough to say, that its northern boundary was fixed at latitude 31° north. This proclamation then goes on to declare, among other things, “ that it is just, and reasonable, and essential to our interest, and the security of our colonies, that the several nations or tribes of Indians, with whom we are connected, and who live under our protection, should not be molested or disturbed, in the possession of such parts of our dominions and territories, as not having been ceded to, or purchased by us, are reserved to them, or any of them, as their hunting grounds.”
It then goes on to' declare, that no governor, in any of said provinces, shall presume, “ upon any pretence whatever, to grant warrants of survey, or pass any patents for lands, beyond the bounds of their respective governments, as described by their commissions.” It farther declares, “that, for the present, all the lands not included within the limits of said new governments, shall be reserved under the sovereignty, protection and dominion of the crown, and forbids all purchases and settlements beyond those limits, without special leave and license first obtained.” It goes on still farther to declare a principle which seems to have *175 been adhered to ever since, “ that no private person do make purchase of any land from any Indians, but that the same shall be purchased only for the government, in the name of the sovereign, at some public meeting of the Indians.” This principle, the offspring of a just and enlightened policy, became incorporated into the intercourse of England, with the Indian tribes, and has been adopted and pursued by eur own government, in all its transactions with them.
The Indian title to the country in which this tract of land lies, Was not then extinguished. In point of fact, it was not extinguished until May, 1777, when the Choctaws relinquished their title to it, by a treaty at Mobile with the British superintendent of Indian affairs. This is the relinquishment referred to in the act of the legislature of Georgia, creating the county of Bourbon, in 1785; and it was confirmed by the treaty between those Indians, and the United States, at Hopewell, on the 3d of January, 1786. See 5 Hall, Law Journal, 363 - 390; United States Stat. at Large, Vol. 7, p. 21, Indian Treaties. The country embraced in the relinquishment extended from the mouth of the Yazoo, down the Mississippi, till it intersects the 31st degree of north latitude, and reached in the interior at the beginning, some fifteen, and at the lower end some sixty miles. Unless we hold that the extension of the limits of Florida, by the commission to her governor, which took place some years before this relinquishment by the Indians, abrogate the provision in the proclamation against grants of land to which the Indian title had not been extinguished, to the extent of the new bounds, we must hold that the grant to Campbell, in 1772, had in itself no intrinsic validity, because the lands were not subject to be granted, until their title was relinquished. On this part of the proclamation fo 1763, the Supreme Court of the United States say, “This reservation is a suspension of the powers of the royal governor, within the territory reserved.” Fletcher v. Peck, 6 Cranch, 142. It is because of this suspension, which existed at the date of this grant, that we think it has no intrinsic validity. It is an established principle in our jurisprudence, that a grant of land on which the Indian title has not been extinguished, is void. Dunforth. v. Wear, 9 Wheat. 676.
*176 In the war between the French, and the Natchez tribe of Indians, which terminated about the year 1730, in the extinction of that tribe, the Choctaws were the allies of the French, and gave them very efficient aid. It is probable from the fact of the treaty made by the British with them at Mobile, in 1777, before mentioned, that they succeeded to and occupied the hunting grounds of the Natchez, in virtue of the conquest. They do not appear to have been ceded to any one. 1 Martin’s Hist. Louisiana, 280-287; 1 Monette, 274 Be this as it may, when the prohibition on the governor of West Florida, to grant lands beyond the limits of his province as then fixed, is established in 1763, it becomes incumbent on those claiming under his grant, to show that the prohibition had been removed.
This view derives support from the fact, that congress, in the act passed to carry the cession made by Georgia into effect, directs that those persons who had obtained, either from the British government of West Florida, or the Spanish government, any warrant or order of survey for lands in said territory, to which the Indian title had been extinguished, should be confirmed therein. The inference is, that, unless the Indian title had been extinguished at the time the warrant or order was issued, there was to be no confirmation. The farther infez’ence is, that, in the opiniozr of congress, no grant would have been made of land to which the title was not extinguished at the time, of if made, that it would not be valid. The same act of congress, also, provides for the survey and sale of the lands in said territory, to which the Indian title had been extinguished, but carefully withholds fronz the operation of the law, all such lands as the Indians had not ceded. The treaty of cession, betweezi Georgia and the United States, itself provides, that the latter government shall extinguish the Indian title to all the lands in Georgia. By reason of this principle and of this policy, a large portion of the lands in this State have been in the occupancy of the Indians, and withheld from sale until a recent period.
There is another ground on which this conclusion znay rest with equal security. The claimants under both the grants involved in this controversy, submitted them to the Board of Com *177 missioners constituted under the act of congress to cany the cession made by Georgia into effect. This was an acknowledgment that their claims were subordinate to the act of cession. Having thus submitted to claim under it, neither party can now be permitted to claim above it. If the plaintiffs were not disposed to acquiesce in the articles of cession, and intended to set up a paramount right, they should have done no act which could be construed into assent.
Having come to the conclusion that the British grant did not of itself confer a valid title on the grantee, we proceed to the consideration of the effect of the confirmation.
The supreme court of the United States, decided in the case of Hickey v. Stewart, 3 How. S. C. Rep. 756, that the decision of the board of commissioners in regard to warrants or orders of survey of the Spanish government, was final and conclusive between the parties, and that consequently the title first confirmed was best. In other words, such title' was incomplete, only became perfect by confirmation, and therefore derived its efficacy from the confirmation. But in this case, the title was a grant, and occupies a different footing from a mere warrant or survey. If the grant were valid in its inception, then the certificate of the board of commissioners confirmed the title by relation to its date, so far as the government is concerned. But this doctrine of relation is a mere fiction of the law, for the furtherance of justice, and will not be permitted to work prejudice to any one. It is settled, that the confirmation of a void patent shall not, by relation, affect the rights of a third person. 3 Comyn, Dig. 141, Confir. D. 5; Heath v. Ross, 12 Johns. 140. In this case, the rights of Calvit’s representatives interfere with those of Campbell’s. Neither patent was valid in itself — indeed they were both void, and derive their whole validity from the articles of cession and the confirmation under it. The doctrine of relation will not be permitted to work an injury to either of them. The onl)rway to avoid this is, to give effect to both from the date of the cession, from which alone they derive their validity. The consequence of this is, the plaintiffs must fail. In a case of equal right, the condition of the defendant is best. *178 Murfree v. Carmack, 4 Yer. 270; 3 Litt. 265. The issuance of both a British and Spanish grant for the same land, was not contemplated by the articles of cession, 'and is not expressly provided for, but as the case has occurred, it must be decided by the general principles of jurisprudence. The cession gives neither any preference over the other.
By the statute of limitations, the right of the defendants is equally clear. John Campbell died about 1777, leaving two daughters. Alston was then in the actual possession of the land. In consequence of his participation in a rebellion against the Spanish government, he fled the country about 1782, and returned about 1800, after it had come into the possession of the United States. During his absence there appears to have been no occupancy of it. On his return he settled adjoining the land, and it is in proof, that Roach either made a lease or conditional sale of the land to the two sons of Alston, who took possession of it. They were turned out of possession by an action of ejectment in favor of Calvit in 1S07 or 1808, and Calvit and those claiming under him have retained possession ever since. This suit was commenced in March, 1841.
If we are correct in holding, that, the title of Campbell’s heirs only became complete at the date of the cession by Georgia, then Mrs. Roach, the wife of Roach, and mother of the plaintiffs, obtained no title, because she was, according to the weight of the evidence, dead before 1802. Beyond all doubt she was dead before the date of the confirmation in 1805. That act could not resuscitate a right in her, which by her death had descended to others. The confirmation was to the “ legal representatives of John Campbell, deceased.” The title, therefore, vested in her children. Roach, her husband, was not one of the legal representatives of Campbell, although in the petition, which he filed for confirmation of the grant, he describes himself “ as the only surviving heir and legal representative of John Campbell, deceased.” This petition in itself puts an end to his claim as tenant by the curtesy, for he rests it upon the higher ground of descent and heirship in himself. The adverse possession of those under whom the defendants claim commenced *179 in 1S08, at least thirty-two years before the commencement of this suit. This constitutes a bar, unless the plaintiffs could bring themselves within some exception of the statute, which they have failed to do.
There are other demises in the declaration, than those from the descendants of Mrs. Roach. But that was the title principally relied on in argument, in support of the judgment of the court below. What we have said applies with' equal force to the other lessors.
The judgment is reversed, and a new trial awarded.