## Case No. 10,697.

### PALMER et al. v. UNITED STATES.

#### [1 Hoff. Land Cas. 249.] [1]

District Court, D. California. Sept., 1857.[2]

MEXICAN LAND GRANTS—GRANT AFTER DECLARA-
TION OF WAR—BONA FIDES OF GRANT.

1. The power of the Mexican government to grant lands in California was unimpaired by the declaration of congress that war existed, and the prosecution of that war by the executive, and did not cease until the actual conquest of the country.

2. The declaration in the projet of the treaty between the United States and Mexico that no grants of land had been made by the latter subsequent to May 13, 1846, which declaration was stricken out by the senate, cannot bar the rights of persons claiming lands under grants made since that day, and before actual conquest; those rights being held sacred by the laws and usages of civilized nations, and not affected by treaty stipulations.

3. The date of the actual conquest of California not necessary to be judicially ascertained, so far as the decison of this case is involved.

4. The claim must be rejected, on the ground that the bona fides of the grant have not been sufficiently established by the evidence.

Claim for two leagues of land in San Francisco county, rejected by the board, and appealed by claimants.

[The case was previously twice heard upon motion by [Joseph C. Palmer and others, claiming the rancho Punta de Lobos] to set the case for hearing. Cases Nos. 10,695 and 10,696.]

E. L. Goold, for appellants.
P. Della Torre, U. S. Atty., and Edmund Randolph, for appellees.

---

1 [Reported by Numa Hubert, Esq., and here reprinted by permission.]
2 [Affirmed in 24 How. (65 U. S.) 125.]

OPINION OF THE COURT. Before proceeding to an examination of the merits of this case, a general objection to the validity of the grant must be considered. The grant purports to have been executed on the 25th of June, 1846, subsequently to the declaration of war between the United States and Mexico. It is contended, on the part of the United States, that on general principles of public law, grants made flagrante bello, when conquest has been set on foot, and actual occupation is imminent and inevitable, have no validity against the subsequent conqueror. The question has not heretofore been presented to this court. It has been discussed with much ingenuity and ability. It is urged that in the conduct of war and the determination of its objects, the political department is supreme; and that the judiciary are bound by the view taken of the war by the political branch of the government; that although congress has alone power to declare war, to the executive is given the right of shaping it to its ends or of declaring its objects.

To ascertain its objects resort must, therefore, be had to executive acts, and as the executive acts in this case unequivocally indicate that a principal object of the war was to acquire California, that acquisition was thus brought within the scope of the war, and must be so regarded by the courts. To this point the case of Harcourt v. Gaillard, 12 Wheat. [25 U. S. 523], is cited. Such being the object or scope of the war, it is urged that the intended conquest of California embraced not only the establishment of sovereign rights in the territory, but also the acquisition of the public property within it. That the proprietary rights to be acquired by the conquest are as essential, though not as important a part of the fruits of conquest, as the political rights, the commercial and other advantages proposed to be obtained, and that no part of these objects of the conquest is to be ignored. The conquest of California, including the acquisition of the public domain, having been thus shown to have been the object, or brought within the scope of the war, it was urged that any grants of public land made after the conquest was projected, and when it was about to be effected, though before it actually occurred, must be deemed to be in fraud of the rights of the incoming conqueror, and invalid as against him.

The foregoing statement is believed to present the outline of the argument submitted on the part of the United States. Both the premises and the conclusion must be examined. If the conquest of California was the object of the war, it must be so considered, because that object was avowed by competent authority when war was declared, or because it was made the object of the war after its commencement by the political branch of the government. It may be ad-

mitted that this government had long regarded California, or the Bay of San Francisco, as an important and desirable acquisition. The instructions of the president to Mr. Slidell indicate the wish of the executive to obtain it by purchase and cession, as Louisiana and Florida had been acquired. It by no means follows that the intention to obtain it by force of arms or conquest can be attributed to congress, still less that such was its object or motive in declaring war. The law by which war was declared recognizes it as previously existing by the act of Mexico, and it is known that hostilities arose from the invasion by Mexico of a territory claimed by the United States to be within their limits. Such was not, therefore, the object for which war was declared, or its existence recognized, nor could it constitutionally have been.

It is observed by Chief Justice Taney, in Fleming v. Page, 9 How. [50 U. S.] 614: "The genius and character of our institutions are peaceful, and the power to declare war was not conferred upon congress for the purpose of aggression or aggrandizement, but to enable the general government to vindicate by arms, if it should become necessary, its own rights and the rights of its citizens. A war, therefore, declared by congress can never be presumed to be waged for the purpose of conquest or the acquisition of territory." As a limitation upon the power of congress this distinction may practically be unimportant. As every war in which the country may be engaged must be regarded by all branches of the government, and even by neutrals, as a just war; and as nations can readily cloak a spirit of rapacity and aggression under professions of justice and moderation, it is at all times easy, should our country be animated by such a spirit, to declare an aggressive war to be undertaken in self-defense, and an intended conquest to be desired only as a compensation for past or security against future injuries. But the distinction is important when a court is asked to presume that conquest was the object of the war. Under our government, at least, such a presumption cannot be indulged. The conquest of California being thus shown not to have been the object for which war was declared, we may next inquire whether by the acts of the executive under its power to conduct the war, it became such, or was brought within its scope, in the sense in which the phrase was used at the bar?

In his annual message to congress in December, 1846, the president distinctly states that the war originated in the attempt of Mexico to reconquer Texas to the Sabine. After adverting to the considerations which had induced the executive to interpose no obstacles to the return of Santa Anna, the latter being more favorably disposed to peace than Paredes, who was then at the head of affairs, the president observed: "The war has not been waged with a view to conquest, but having been commenced by Mexico, it has been carried into the enemy's country, and will be vigorously prosecuted there with a view to obtain an honorable peace, and thereby secure ample indemnity for the expenses of the war, as well as our much injured citizens, who have large pecuniary demands against Mexico." Similar declarations are frequently and emphatically reiterated by the president in various communications to congress, and in the correspondence between the American commissioner and the Mexican authorities. The object of the war, therefore, as indicated by executive acts and declarations, was not conquest, or if conquest, it was that of a safe and honorable peace.

It is true that after the military occupation of California, and after our arms had been everywhere successful, and perhaps at the commencement of hostilities, the executive and the nation may have confidently anticipated that by the treaty of peace we would acquire California. As Mexico was known to be impoverished and distracted by dissensions, it was obvious that the only indemnity she could afford us for the expenses of the war was the cession of a portion of her territory. The instructions of the secretary of state to Mr. Trist show that the extension of the boundaries of the United States over New Mexico and Upper California, for a sum not exceeding $20,000,000, was a condition sine quā non of any treaty. The extraordinary successes of our arms, the fact that we already held possession of a great part of the territory of the enemy and virtually of his capital, our great expenditures of blood and treasure, entitled us to retain a portion at least of our conquest, as the only indemnity we could obtain. But we were willing to restore a considerable part of our acquisitions, and to pay for that retained by us a large amount of money. But such views and intentions on the part of the executive as to the condition on which the war should cease, are very different from waging it with a view to conquest. The war then cannot, in any just sense, be deemed to have been declared by congress, or conducted by the executive, with a view to conquest. The power of the president in the conduct of the war was that of commander in chief of the army and navy. He had authority to direct and control military operations. As part of the treaty-making power, he could determine where and on what conditions a treaty of peace should be made. But he had no power to impress upon the war a purpose different from that with which it was commenced, and which, as Chief Justice Taney declares, congress could not constitutionally entertain. "The law declaring war," observes the same great authority in the case above cited, "does not imply an authority to the president to enlarge the

limits of the United States by subjugating the enemy's country. The United States, it is true, may extend its boundaries by treaty or conquest, and may demand the cession of territory as the condition of peace, to indemnify its citizens for the injuries they have suffered, or to reimburse the government for the expenses of the war. But this can be done only by the treaty-making power, or the legislative authority, and is not a part of the authority conferred upon the president by the declaration of war. His duty and his power are purely military. As commander in chief he is authorized to direct the military and naval forces placed by law at his command, and to employ them in the manner he may deem most effectual to harrass and conquer and subdue the enemy. He may invade the hostile country and subject it to the sovereignty and authority of the United States. But his conquests do not enlarge the boundaries of the United States, nor extend the operations of our institutions and laws beyond the limits before assigned them by the legislative power."

It is true that in the case in which these observations are made, the point to be determined was whether enemies' territory, which in the course of hostilities had come into our military possession, became a part of the United States and subject to our general laws. But they are important to this case as defining the power of the president in war to be merely that of the military commander in chief; that territory can be acquired only by the treaty-making and legislative authority, and consequently, the fact that hostilities are by the military power directed against a particular portion of the enemy's territory, cannot be said to make the acquisition of that territory the object of the war. It is therefore apparent that the war with Mexico cannot be regarded by the judicial department of this government as commenced or conducted with the object of effecting the conquest of California. The most that can be said is, that its military occupation was effected as a means of crippling and subduing the enemy, and with the expectation on the part of the executive that we would retain and finally insist upon the cession of the territory so subjugated by our arms, as an indemnity for our injuries and expenses. The nature and amount of indemnity to be required, the extent of territory to be ceded, depended upon the will of the senate and the executive as the treaty-making power; and until that will was expressed in the treaty, the intention to effect the permanent acquisition of all California cannot be attributed to the political power, any more than a similar intention with regard to those conquests which at the close of the war were restored.

If, then, it were a principle of public law that all alienations of public domain by a sovereign are invalid as against an enemy who has commenced or is prosecuting a war, with the object of conquering the territory within which the property is situated, or who has set on foot expeditions for the purpose with sufficient power to attain the end, as proved by the event, the facts of this case would hardly admit of its application. But assuming the facts as contended for by the United States, we proceed to inquire whether such a rule of law exists. The right of Mexico to dispose of her public domain in California before the war is admitted. It is not denied that that right ceased as against the United States when the latter effected the conquest of the country and subverted the Mexican authority. If it ceased before the actual conquest and displacement of the Mexican authority, it must be because the determination of the United States to effect the conquest, and the making preparation to carry out its determination, gave to the latter some inchoate or inceptive right to the territory subsequently conquered, and the title consummated by the conquest relates back by a kind of fiction to the date of its inception. We have been unable to discover any trace or intimation of such a doctrine in any writer on the laws of war. The rights derived from conquest are derived from force alone. They are recognized because there is no one to dispute them; not because they are, in a moral sense, right and just. The conquest of an enemy's country, admitted to be his, is not, therefore, the assertion of an antecedent right. It is the assertion of the will and the power to wrest it from him. Even where a conquest is effected to obtain an indemnity justly due, it is not the assertion of any antecedent right to the particular territory conquered, but only of the general right to a compensation for injury. The right of the conqueror is therefore derived from the conquest alone. It originates in the conquest, not in the intention to conquer, though coupled with the ability to effect his purpose, nor even in the right to conquer as a means of obtaining satisfaction for injury. It is the fact of conquest, not the intention or the power to conquer, which clothes him with the rights of a conqueror. The rights acquired by the conquest are temporary and precarious until the jus post liminii is extinguished; and if a reconquest is effected, the rights of the sovereign who has temporarily been displaced revive, and are deemed to have been uninterrupted. The term title by conquest expresses, therefore, a fact and not a right. Until the fact of conquest occurs, the conqueror can have no rights. To affirm that a title acquired by conquest relates back to a period anterior to the conquest, is almost a contradiction in terms. Until, then, the conquest is effected, the rights of the existing sovereign remain unimpaired. He can therefore dispose of the public property at his discretion; nor can that right be effected by the determination of an enemy to conquer the territory, and by his preparations for the purpose, though the event may demonstrate the conquest to have been practicable.

The case of Harcourt v. Gaillard [supra],

has been cited by the counsel of the United States in support of the doctrine contended for by them. The distinction between that case and the case at bar is obvious. In Harcourt v. Gaillard the question was as to the validity of a grant by a British governor of land within a territory claimed to belong to the United States. As our government had asserted and maintained by arms its title to the disputed tract, the judicial department were not at liberty to declare the claim to be wrongful, and to recognize the right of any other sovereign over the territory in question. The title of the United States was in no sense acquired by conquest. Her title was antecedent to the war—it was merely maintained by arms and recognized by the treaty of peace. The question presented was, in the language of the court, "one of disputed boundaries, within which the power that succeeds in war is not obliged to recognize as valid any acts of ownership exercised by his adversary." . Had the claim been that of conquest alone, the case would have presented, say the court, more difficulty. "That ground would admit the original right of the governor of Florida to grant, and if so, his right to grant might have continued until the treaty of peace, and the grant to Harcourt might in that case have had extended to it the principles of public law which are applicable to territories acquired by conquest, whereas the right set up by South Carolina and Georgia denies all power in the grantor over the soil." The distinction is made still more apparent in a subsequent part of the opinion of the court: "War is a suit prosecuted by the sword; and where the question to be decided is one of original claim to territory, grants of soil, made flagrante bello by the party that fails, can only derive validity from treaty stipulations. It is not necessary here to consider the rights of the conqueror in case of actual conquest." 12 Wheat. [25 U. S.] 523. The latter is precisely the question to be considered in the case at bar. The argument of the counsel for the United States can, therefore, derive no support from the case referred to. It is proper, however, to observe that the case of Harcourt v. Gaillard was not cited by counsel as directly in point. It was thought to establish that all grants of territory brought within the scope of the war are invalid; that the case of disputed boundaries presents but an illustration of the general principle, while the case at bar furnishes another. It has seemed to me, however, that the principle of that decision relates exclusively to the case of disputed boundaries, and that the distinction is clearly drawn between that case and one like the present; that between them the obvious difference exists that the former is a case of "original claim to territory," while the other is one of "actual conquest."

It is said on the part of the United States, that if a belligerent can, after a declaration of war, grant any portion of his property, he can grant the whole, and thus might, by granting himself away, escape responsibility. The case supposed is an extreme one. It can rarely occur that a nation will seek safety by self-destruction. But in such case the adversary might refuse to recognize such a voluntary suicide as affecting his rights. For the purpose of obtaining satisfaction he might justly treat the nationality sought to be extinguished as still existing. But at all events, his rights could be enforced against the successor or grantee of the extinguished sovereignty. The question would then be purely political; for the new sovereign, whether to carry on the war or accede to the demands of the enemy of his grantor; and for the latter, whether to prosecute the war against the new sovereign. Little aid, however, can be derived from the consideration of such extreme and improbable cases. It is further urged that the doctrine contended for on behalf of the United States is in the prize law. It may perhaps be admitted that a theory of maritime prize formerly obtained, which assumed that a belligerent has a vested right by the declaration of war in all sea-borne private property of the other belligerent; that no such property can be the subject of lawful sale; that all contracts of sale touching belligerent property of any sort, though valid on land, are invalidated by the mere fact of such property being embarked on the ocean, and that if transferred to a neutral after the declaration of war, it is a lawful prize to the other belligerent. Such is not now the received law of nations. It is now admitted that the bona fide sale of the ships of belligerents to neutrals in time of war is lawful and valid unless made in transitu.

In The Johanna Emilia, 29 Eng. Law & Eq. 562, Dr. Lushington says: "It is not denied that it is competent for neutrals to purchase the property of enemies in another country, whether consisting of ships or anything else. They have a perfect right to do so, and no belligerent right can override it." Such is the doctrine maintained by our government. See opinion of Attorney General Cushing, October 8, 1855. If a sale to a neutral of a ship in transitu is held invalid as against a belligerent, it is not by reason of any inchoate right or lien acquired by the latter by the mere declaration of war, or because the right of the enemy to dispose of his property is invalidated by the declaration of war, but because a sale of a ship in transitu is taken as proof of collusion and fraud, and as showing that no absolute transfer has in fact been made. The soundness of even this rule is doubted by the attorney general in the opinion referred to. A sale of a ship not in transitu, by a belligerent to a neutral, is valid as against a subsequent captor, no matter how imminent the danger of capture would have been had she remained enemy's property, and no matter what may be the number of hostile fleets fitted out to cruise against her and similar property of the bel-

ligerent. It appears, then, that the law of nations with regard to prize of war does not recognize the principle contended for. It is urged, however, that this principle lies at the foundation of the doctrine of post liminii. It is argued that a state of war implies the reciprocal denial by each belligerent of all rights of the other. That each relies upon force alone—force to retain or force to take. They are thus in æquali jure.

The principle, therefore, by which, on a reconquest, the original title revives, and is deemed to have been uninterrupted, is founded on the presumption that the displaced sovereign intended a reconquest when he was displaced, and his title on a reconquest relates back to the time when he is presumed to have formed such intention. If, then, (it is argued) the title by reconquest relates back to the time of the formation of the intention to reconquer, the title by conquest must relate back to a similar period—for a state of war implies the negation of all antecedent right on either side. The only difference between the cases being, that in the case of a reconquest, the intention to reconquer is presumed until the jus post liminii is extinguished; while in the case of conquest, that intention must be shown by the political acts and declarations of the conqueror. The argument is ingenious, but the premises are, I think, erroneous. It is assumed that a new title is acquired by a sovereign who recovers territories from which he has temporarily been driven. On the contrary, he holds it by his original title, which could only have been displaced by a permanent conquest. But the fact that he recovers the territory proves that what seemed a conquest was but a temporary dispossession. The invader, therefore, acquired no rights, nor did the original sovereign lose any. He continues to rule, not by a newly acquired title which relates back to any former period, but by his ancient title, which, in contemplation of law, has never been divested. Nor is it true that war is the reciprocal denial of all rights by the belligerents, with respect to the territories of either. A conqueror does not deny that the territory seized was at the time of the conquest the territory of his enemy, any more than the attaching creditor denies the property attached to be that of his debtor. On the contrary, he asserts it to be his. He seizes it as the property of his enemy, and because it is his. He asserts no antecedent title in himself. He declares, not that the territory was his, but that he will make it his by conquest. The title or right acquired by a conquest is not the same as that of the original possessor. It is temporary and precarious, and ceases the moment the conqueror is expelled: if, indeed, a title by conquest can be said ever to have existed, when the event has proved that the attempted conquest could not be maintained. The title of the original owner is wholly unaffected by the temporary dispossession, and even during his dispossession it

is treated as valid and subsisting until the jus post liminii has been extinguished. The extinction of the post liminii is necessary to ripen the temporary and merely possessory right of the conqueror into such an ownership of the territory as neutrals can recognize.

If these views be correct, the case of a reconquest does not present the instance supposed of a title relating back to the period of the formation of the intention to reconquer. But the further discussion of this subject would require more time and space than can be devoted to it. It might, I think, be demonstrated, that a rule which supposes all rights of a sovereign, with respect to territory subsequently conquered, to cease as against the conqueror, not when war is declared, but when the war is prosecuted with the object of conquest, when expeditions are fitted out for the purpose, and when the conquest is "imminent and inevitable," is not susceptible of practicable application as a rule of international law. That those rights must continue until the date of actual conquest, or of the treaty of cession, or else must cease at the declaration of war; and that an attempt to estimate the "imminency" of the conquest at any intermediate period, or to try the validity of the exercise of sovereign rights, by calculating the chances of war at a particular moment, would be impracticable and illusory.

On the whole, we are of opinion that the right of Mexico to grant her public domain in California continued until the conquest of the country by the United States.

It is further urged, on the part of the United States, that grants made after the 13th of May, 1846, are not protected by the treaty of peace, because such was not the intention of the parties. That the Mexican commissioners who negotiated the peace, and who represented the claimants as well as the Mexican government, solemnly, and after special inquiry, declared that none such existed. That the treaty was negotiated on the faith of this declaration. It is admitted that such a declaration was made and embodied in the projet of the treaty submitted to the senate. Had this declaration been contained in the treaty as adopted and ratified, it might very possibly have been regarded as a covenant or stipulation that such grants should not be deemed valid by the United States. But the clause containing it was struck out by the senate; not by the general vote which struck out the whole of the tenth article of which this declaration formed a part, but by a distinct vote upon the question whether this particular clause should stand as a part of the treaty. The court cannot assume therefore, that the treaty was assented to by the United States on the faith of this declaration by Mexico; else, why strike it out? It may, not unreasonably, be supposed that the senate refused to allow the declaration to remain, because they were willing that grants

made after the 13th of May, if any such there were, should be submitted to the courts, and rejected or confirmed, as might be just.

But, assuming that the treaty was concluded on the faith of this declaration, the rights of an individual to his property cannot be affected by it. The stipulation in the treaty by which the property of the inhabitants of the ceded territory was secured, conveyed to them no additional rights. "An article to secure this object, so deservedly held sacred in the view of policy as well as of justice and humanity, is always required and never refused." [Henderson v. Poindexter] 12 Wheat. [25 U. S.] 535. "When such an article is submitted to the courts, the inquiry is whether the land in controversy was the property of the claimant before the treaty." U. S. v. Arredondo, 6 Pet. [31 U. S.] 712. If, then, the land in controversy was the private property of the claimant when the country was acquired, it must have remained such, though no treaty had been made. The United States do not claim to have acquired the ownership of any other property than the public property of the enemy, nor could they justly have demanded that Mexico should assent by the treaty to the confiscation of any property, the right to which was vested in private individuals. If, then, the United States have been willfully or accidentally deceived, as to the amount of property held in private ownership in the ceded territory, they may have a right to demand a return of some portion of the pecuniary equivalent paid by them. The fraud or mistake of the Mexican commissioners can have no effect upon a private right, held sacred by the laws and usages of all civilized nations, which was not derived from the treaty, and which, had it been known to exist, the United States would have been bound to respect. These observations are made with reference to the general proposition maintained at the bar, viz.: that the declaration by Mexico that no grants had been made subsequent to May 13, 1846, invalidated all such grants to the same extent as if a stipulation to that effect had been embodied in the treaty.

We proceed to consider the merits of the case at bar. The claim was rejected by the board for want of proof of the mesne conveyance through which the claimants derive title. That defect has been supplied by evidence taken in this court. In support of their title the claimants have produced: (1) A petition, in the usual form, addressed to the governor by Benito Dias, for the land called "Punta de Lobos," and dated April 3, 1845. On the margin of this petition is an order for information, dated May 24, 1845. (2) The "informes" of the officers, as required by the governor. (3) The formal grant signed by Pio Pico, governor, and José Matias Moreno, secretary, and dated June 26, 1846. The claimants have also produced a private letter from Juan Bandini, secretary of the governor, dated on the same day with the order for information to Benito Dias, in which he expresses to the latter his regret that he had not first obtained the certificates of other officers and sent them with the petition, "in which case he would have had the pleasure of sending him all his matters concluded." The signatures to these documents are proved by the testimony of Pio Pico himself, and by other witnesses, nor has any attempt been made to call in question their genuineness. It is suggested, however, on the part of the United States, that they were signed subsequently to their date, and after the final subversion of the Mexican authority in California. Benito Dias, the original grantee, was examined as a witness by the claimants, he having assigned all his interest in the grant. He states that the grant was in his handwriting, and that he wrote it and sent it to the governor for signature, in consequence of a letter from Bandini, secretary of the governor, stating that the grant must be obtained immediately, as the country was in a critical state; that this was done on the 20th or 21st of June, at San Francisco; that he received the grant on the 5th or 6th of July, at Monterey; and that it was handed to him by Antonio Maria Osio, who received it from Celis, the courier of Dias, to whom it had been delivered by the governor. That the grant was signed by Pio Pico, at Santa Barbara, or Buena Ventura, the courier whom Dias had dispatched to Los Angeles having met the governor on the road at one or other of those places. Bernardino Soto, a witness in behalf of the claimants, swears that about two or three days before the taking of Monterey, which was on the 7th of July, 1846, he and his father were taking tea at the house of Dias, in Monterey, when Don Antonio Osio came in and handed Dias a letter. That Dias read its contents, appeared to be much pleased, and said it was a grant for the "Punta de Lobos." The witness is enabled to fix the date of this occurrence by the circumstance that he and Dias had been sent from Santa Clara to get supplies for the troops at Monterey; that he left Santa Clara on the 4th of July, which is a great feast day with the Californians, and that he arrived at Monterey the same night, when, as he relates, Dias received the title. Dias further states, that a short time afterwards he showed the title to Manuel Dutra, with whom he left it as security for a loan of $40. Bernardino Soto confirms this statement, and testifies that about two or three days after the taking of Monterey he, with Don Gabriel de la Torre, were in the house of Dutra, when Dias applied for the loan of some money, and on being asked for security he produced the title. Dutra gave him some money, and Dias left the title in his hands; after he had gone, Dutra began to read the paper, and

asked the witness if he knew the tract called Punta de Lobos, to which he replied that he did. Manuel Dutra testifies to the same facts. He states that he had the title in his possession for more than a month, when, on being repaid, he returned it to Diaz, who stated that he wanted it for the purpose of selling the land to Thomas O. Larkin. That Bernardino Soto and Gabriel de la Torre were present and informed him where the Punta de Lobos was. Gabriel de la Torre gives substantially the same account, except that he denies having told Dutra where the land was situated, as he did not know, nor did he hear Soto tell Dutra its situation. It is further shown by the claimants, that on the 19th of September, 1846, Benito Diaz conveyed all his interest in the land to Thomas O. Larkin. The deed to the latter is produced. I do not understand it to be disputed that at that date the grant was in existence. It further appears by the evidence of Col. Stevenson that Pio Pico finally left the country on the 8th of August. The hypothesis of fraud, therefore, supposes that the grant was signed at some date between the 25th of June and the 8th of August.

The United States have produced as a witness, Vicente Gomez. He swears that he, Benito Diaz, and Cayetano and Luis Arenas, were present when Pio Pico signed the grant. That it was signed after the Americans took possession of Monterey. To rebut this testimony the claimants have examined, since the appeal, Cayetano and Luis Arenas. Both of these witnesses deny having been present on the occasion referred to by Gomez. They state that they never saw Pico sign any papers after the 7th of July; that they never saw the title to Punta de Lobos, and do not even know where the land lies. José L. Luco and Juan M. Luco, witnesses called by the claimants, swear that Gomez, in conversation with them, denied all knowledge of the Punta de Lobos grant, and that he had given the testimony contained in his deposition. José L. Luco also swears that Gomez' character for veracity is bad, and that he would not believe him on oath in matters relating to land titles. Jas. C. Crane and John H. Watson are the only remaining witnesses introduced by the United States. These witnesses swear that in the spring of 1851, Benito Diaz stated to them that the grant of Punta de Lobos was made after the hoisting of the American flag at Monterey, and was antedated. These declarations, if made at all, were made several years after Benito Diaz had parted with all his interest. No previous inquiry as to them has been made of Benito Diaz, when examined as a witness. I know of no rule of law by which the testimony could be admitted. Benito Diaz was, however, reëxamined in this court, and stated, with reference to these declarations, that he knew Crane and Watson; that he never had any conversations with the latter, as he did not speak Spanish, except on one occasion

when Crane acted as interpreter; that he had always told Crane that the title was good, except that once "after Gomez had made statements about the title, Crane asked him if it was not made in August, to which he laughingly replied: Yes, yes, just as Gomez says." The above comprises all the testimony adduced by the United States in opposition to the claim.

No attempt has been made on the part of the United States to show the signatures of Pico and Moreno to be forgeries. It is insisted, however, that the grant is antedated, and that it was in fact signed after the conquest of the country. It is stated, as we have seen, by Benito Diaz, that the grant was written by him in San Francisco, on the 20th or 21st of June, and sent by a courier to the governor for signature. On examining the original grant on file in the surveyor general's office, we find that the date is in writing and not in figures, and the words "veinta y cinco de Junio," are obviously written by the same hand, with the same ink and at the same time as the rest of the instrument. There can be no doubt that Benito Diaz, or whosoever drew the grant, filled in the date at the time he drafted the instrument. No trace can be discovered of any blank having been left to be filled up when the grant was signed, and the writing and the color of the ink are palpably different from those of the signatures of either Pico or Moreno. The certificate stating that a record of the title has been taken "in the corresponding book," is also in the same hand-writing as that of the body of the grant. The statement of this fact must therefore have been made by Diaz, like the insertion of the date, by anticipation. If the statement be true, where is the "corresponding book?" It has not been produced. If Moreno can remember that he signed the grant on the 25th of June, on the road at a distance from his office, he could doubtless remember the fact that he recorded it, and perhaps he could explain how it happened that when accompanying the governor on a distant journey, at a period of great public disorder, he took with him a book of records usually kept among the archives of his office. He might at least tell what has become of the book. On these points no explanation is offered by the claimants; on the hypothesis of fraud, however, a natural explanation suggests itself.

When the grant was fabricated, it was not considered that it could be proved that Pio Pico was not in Los Angeles at the date of the grant. The certificate of record was accordingly added and Moreno's signature procured. When, however, it became necessary to allege that the grant was signed upon the road, to meet the objection that Pico was not in Los Angeles at its date, it was too late to alter or erase the certificate of record, notwithstanding that the making of such a record was inconsistent with the other circum-

stances under which it was requisite to show the grant to have been executed. If then the date was affixed to the instrument before it was signed, it affords no evidence of the true time of its signature. Matias Moreno, however, testifies "that he saw the grant on the 25th of June, when he signed it." The witness does not explicitly state that he signed the grant on the day that it bears date. He uses the expression above quoted, which was doubtless intended to convey that idea. Pico himself was also examined, but he answers with singular reserve. On being asked if the signatures were genuine, and the instrument executed for the purposes therein mentioned, he merely replies "I believe the signatures are genuine." He does not state when they were affixed, nor for what purpose. If the grant was signed on the 25th of June, the coincidence is extraordinary. It is, of course, not impossible, but it is in the highest degree improbable, that Benito Diaz, when he drew it in San Francisco on the 20th or 21st of June, under the expectation that it would be signed at Los Angeles, should have guessed so accurately the day on which his messenger would find the governor, and the day on which the latter would sign the grant. And particularly, when the governor was in fact met upon the road at a considerable distance from the place where Diaz expected he would be found. It is also strange that the grant, drawn at San Francisco on the 20th or 21st of June, should have reached the governor on the 25th, on the road between Santa Barbara and Santa Buena Ventura, a journey which must usually have required seven or eight days to accomplish, while it was not returned to the grantee until the 4th or 5th of July, and this, too, at Monterey, at least two days journey nearer than San Francisco to Santa Barbara.

In this connection the nature and subject matter of the grant deserve attention. In his petition to the governor, Benito Diaz, after specifying the boundaries of the tract selected, adds—"observing that the ruins of the presidio of San Francisco, and the castle, which are within the tract, shall remain exempt from the petition, unless it may be that the governor may choose to grant me the said ruins, promising, if that be done, to build a house," etc. By the marginal order of May 28th, the governor refers the petition, not only to the respective judge, but to the military commander for his opinion as to what may be convenient. The judge reports that the land is vacant, but as to the military points he can give no opinion, not knowing their ejidos or the lands appertaining to them. The military commander reports in favor of granting the land "not including in the concession the two military points of the presidio and castle which are included in the petition." The grant, after reciting that the petitioner had applied for the land called "Punta de Lobos," concedes to him in full property "the before mentioned land—el es-

presado terreno." And the third condition states its exterior boundaries without reserving the military points within them. He thus grants not only the fortifications, contrary to the advice of the military authority whose opinion he had solicited, but he does not even insert the condition proposed by the petitioner himself, viz: that a house should be built for the government if the ruins were granted.

But the question arises, had the governor authority to make such a grant? The second article of the law of 1824 declares the object of the law to be "those lands of the nation which not being private property nor belonging to any corporation or town, may be colonized." The intention of Mexico obviously was to promote the settlement of the country, by the gratuitous distribution of its vacant and unappropriated public land. We accordingly find that the principal information desired by the governor, and communicated by the "informes," is whether the land solicited is "valdio," or vacant. If then the law and the governor's authority only extended to "vacant" lands, it must be admitted that the sites of fortifications, occupied as such, are not within the law. It is, however, urged that these fortifications were abandoned and gone to decay, and that their sites had thus reverted to their previous condition of vacant lands. That they had no garrisons, is admitted; but the extent to which the buildings had fallen into decay, is not clear. It is not disputed that some eight or ten cannon remained at the fort, and that its walls as well as the buildings at the presidio, since used as barracks by the United States, must have existed in a greater or less degree of preservation. But the question, whether these points were occupied or vacant, does not depend on whether garrisons were maintained in them, or the degree of preservation of the structures. If the place had been selected and appropriated by the government as a military post—if considerable and expensive structures had been made for military purposes, the occupation of the land would seem to be complete, though every soldier had been withdrawn and the works themselves fallen into decay. The fifth article of the law of 1824 provides that the government of the federation may make use of any portion of the lands of the nation to construct warehouses, arsenals, &c., it may deem expedient, with the consent of congress. It is to be presumed, therefore, that the appropriation and occupation of these military sites must have been made by the government of the federation. Until, then, the federal government determined to abandon them, no governor of a department would be at liberty to treat their sites as vacant public land, because, through accident, neglect or the disturbed condition of public affairs, their garrisons might have been withdrawn, or the fortifications in some degree dismantled. The fort or castle occupied a position unmis-

takably indicated by nature as the site of a defensive work for this harbor. It had been selected as such, perhaps, by the Spanish conquerors, and the United States have since, at the same point, erected the most extensive fortifications on this coast. It is not conceivable that under a general power to distribute vacant lands to actual settlers, it could have been intended to clothe the governor with discretionary power to give to a private individual a spot so necessary to the national defense, which had long been used for the purpose, and on which the cannon of the nation still remained.

If, then, we are right in supposing that the governor had no authority to grant the fortifications of the country to private individuals. the fact that this grant purports to do so becomes a significant and suspicious circumstance Indeed, it would seem incredible that a governor, intending bona fide to exercise the authority entrusted to him for the good of the nation, should, at a time of war and imminent peril, have consented to grant to a private person the site of so important a fortification; that he should have done this on the road where, by accident, both he and his secretary were found; that he should have signed a paper previously drawn up for him by the grantee, and dated at a place, and, in all probability, at a time different from those at which it purported to be executed; that he should have done this contrary to the advice of the military authority whose opinion he had solicited, and without securing the important benefits to the government which the petitioner had himself offered, viz. the erection of a house; and, finally, that no record or official note of so important a transaction should anywhere be found in the archives of the government. Had Pio Pico himself given any satisfactory explanation of these circumstances, our suspicions might have been dispelled. But the witness mentions no one of the facts sought to be established by the claimants, except only that the signatures are genuine, and of this he only expresses his "belief." If the date was affixed to the grant by Dias himself, when he drew it on the 20th or 21st of June, Moreno's testimony that he signed it on the 25th must be false, unless we suppose an almost impossible coincidence to have occurred. If Moreno, the governor's secretary, has sworn falsely, the whole case is tainted by the fraud. The grant appearing to have been dated by Dias himself, before its execution, Moreno's testimony being rejected, and the governor being silent on the subject, the only evidence to show its execution before the change of sovereignty is that of Dias himself, Bernardino Soto, Manuel Dutra and Gabriel de la Torre. No one of these witnesses pretends to have seen the grant before the 5th or 6th of July. Dias, in his first deposition, states that he received the grant two or three weeks after its execution. It is only when examined in this court, that he remembers having received it on the 4th or

5th of July, within nine or ten days after its execution. Gabriel de la Torre, Dutra and Soto swear that they saw the grant a few days after the taking of Monterey, when Dutra was asked to lend $40 upon it. The only witnesses who saw it on the 5th or 6th of July are Dias and Soto.

The conclusion, then, that the grant was executed before the 7th of July, must be founded on the testimony of Dias and Soto alone. We are deeply sensible of the fact that their testimony is positive and circumstantial; that Soto's character has not been impeached, and that the statement of Gomez, that Pico signed the grant in August, in the presence of himself and the two Arenas—is contradicted by the latter—that Gomez' character is impeached—and his testimony, therefore, entitled to but little consideration. But the inquiry recurs: Can we, on the faith of Dias' and Soto's testimony alone, confirm this claim, under all the circumstances? We are of opinion that we cannot. In the investigation of this class of cases, we have been painfully impressed with a sense of the entire unreliability of many of the regular and, so to speak, professional witnesses by whom they are supported, and, in some rare instances, attacked. When, therefore, a grant is presented, of which the archives contain no record, for land of which no possession has been taken, and to which no claim of ownership has been asserted during the former government, the suspicion that it has been fabricated since the change of government is irresistibly suggested. That such has been the case, in some instances, is notorious. That such a fraud was easy while the former governors of this country were alive and accessible, is obvious.

When, therefore, the grant is like the present, one of an extraordinary character—when it appears that the governor, even if he did not exceed his authority, acted with entire disregard of the interests of his country— we have a right to demand a full and satisfactory explanation of the circumstances. When we find Moreno testifying to a fact which is in the highest degree improbable, the governor not only withholding explanation, but silent or evasive as to the real point in controversy—the grantee himself giving a loose and inaccurate statement of the time when he received the grant, although four years afterwards, the date and the circumstances are fresh in his memory—when, in addition to all this, we consider the notorious facility with which testimony like that in support of this claim can be procured—we are unable to resist the conclusion that the bona fide character of this grant has not been established. Whether the bare reception of a paper purporting to convey a title at a time when the grantor had lost all practical dominion over the land conveyed, when no possession was taken, or could have been taken, by reason of the subversion of the grantor's authority by a conquest of the country, conveys

such a right of property as the conqueror, by the principles of public. law, is bound to respect, may be doubted. That question it is not now necessary to discuss.

[On appeal to the supreme court, the decree of this court was affirmed. 24 How. (65 U. S.) 125.]